[Civil No. 1401.    Filed May 4, 1915.]

[148 Pac. 306.]

## HARRY W. HARDINGE, Appellant, v. THE EMPIRE ZINC COMPANY, a Corporation, Appellee.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—RULINGS ON EVIDENCE —PRESUMPTIONS.—Plaintiff, complaining on appeal of the exclusion of evidence as against the objection that it is incompetent, irrelevant and immaterial, is entitled to the benefit of every inference favorable to the competency of the evidence that may be legally drawn therefrom when essential to establish a fact to support a recovery.

2. CORPORATIONS—CONTRACTS—CONVEYANCES—CONSTRUCTION—"OWNERSHIP"—"OWNER."—A corporation, acquiring options for the purchase of mining properties, transferred to a stockholder an undivided interest in the options, "subject . . . to the control, handling and disposal by" the remaining stockholders. Letters between the stockholders indicated that the stockholder purchasing the interest understood that he was to have no control. *Held*, that the transfer did not vest any title, for the reason that one who has no right to control, handle, or dispose of a thing, cannot be considered its "owner," because an essential attribute of "ownership" is the right to control, handle and dispose.

3. QUIETING TITLE—TITLE OF PLAINTIFF.—A plaintiff, in a statutory action to quiet title, may succeed only on the strength of his own title, but it is sufficient, *prima facie*, if he makes out a title apparently good as against defendant.

   [As to necessity of possession in plaintiff in action to quiet title, see note in 45 Am. St. Rep. 375.]

APPEAL from a judgment of the Superior Court of the County of Pima.    W. F. Cooper, Judge.    Affirmed.

### STATEMENT OF FACTS BY THE COURT.

The appellant commenced this action, alleging, in·brief, that he claimed the ownership of an equitable estate in certain

described patented ·mines, amounting to an undivided one-twentieth part of the premises, describing them, and alleging "that he is credibly informed and believes that the above-named defendant [Empire Zinc Company] makes some claims adverse to the complaint and adverse to the plaintiff and the plaintiff's interest and estate, . . . " with the usual prayer for relief in statutory actions to quiet title. Defendant demurred upon the grounds that, no cause of action is stated, set up the three and five years' statutes of limitations, and denies that plaintiff is the owner of any interest, right or title whatever, legal or equitable, in and to the property, and admits that it claims ownership of the property described in fee simple, and the whole thereof. It sets up its source of title from the United States by a regular chain of transfer from and under the said sovereignty of the soil, alleging that it purchased said property from the Arizona-Parral Mining Company, the then owner of the property, on November 16, 1912, and having the property then in its actual possession, paying therefor the sum of $175,000 in cash, and the said property was conveyed by said Arizona-Parral Mining Company to defendant by warranty deed, and said deed was delivered and said purchase price paid, and that the defendant, at the time of the payment and delivery of the deed, had no notice or information that plaintiff claimed any interest in said property; pleaded estoppel by plaintiff standing by for more than 14 years without asserting or in any manner enforcing, or attempting to enforce or maintain, his alleged equities, and alleged that plaintiff ought to be estopped from asserting or claiming any rights or equities against this defendant.

The plaintiff offered evidence tending to show that the Meyer-Clarke-Rowe Mines Company was organized under the laws of Missouri with a capital stock of 100 shares of the par value of $100 per share. Plaintiff was one of the incorporators. The stock was originally divided, one-fifth to each of the five incorporators. Plaintiff had one-fifth; Mr. Murray had one-fifth; Mr. Clarke had one-fifth; Mr. Rowe had one-fifth; and Mr. Meyer had one-fifth. Plaintiff testified:

"The purpose of the organization of that company was a scouting or prospecting company, to find property which could be handed over to capital to develop. ·I rendered con-

tinual services in connection with the corporation until I transferred my stock." "In seeking new properties for development I came to Arizona. . . . Met Mr. Manning in 1898, obtaining from him an option upon certain options that he had to the San Xavier property. Later I induced the Meyer-Clarke-Rowe Mines Company to put its first development money into it, and go ahead and develop the property. . . . They [the Meyer-Clarke-Rowe Mines Company] obtained an option from Mr. Manning and Cameron upon the mines known as the San Xavier group of mines, . . . mentioned in the complaint. . . . After having acquired the options from Manning and Cameron, they acquired (an option on) the Ruby claim. This was while I was a stockholder. They spent a considerable amount of money in development under my management."

Plaintiff was in Kansas City on October 30, 1899, with Meyer, Rowe and Murray. At that time these three, with plaintiff, owned all the stock of the said corporation. All of the directors and officers of the company were the four stockholders, and were present. What took place at the conversation at this meeting was received under an avowal to the effect that the defendant, Empire Zinc Company, had notice of plaintiff's claim of a one-twentieth interest in the mines in question prior to its purchase of and payment for the same. Plaintiff states the conversation as follows:

"I was called to Kansas City on account of the finances of the company going behind. Mr. Meyer and Mr. Rowe objected to carrying the whole burden. They offered me first $1,000 to relinquish my stock interest and a release of any liability against me as a stockholder in consideration of that amount. That I declined. It was later arranged that I should receive for my original 20 per cent a nonassessable 5 per cent, and that Meyer and Rowe, in consideration of their being the majority stockholders and would own all of the final stock, agreed to give me this nonassessable one-twentieth or 5 per cent interest in the San Xavier group of mines, including the Ruby claim. After final arrangements were made . . . Mr. Murray was present, and stated that he was in same condition that I was willing to make. . . . And Mr. Murray would make the same arrangement. . . . I said that I would accept their proposition, and it was so arranged that

the next day the final document was made and drawn up. Mr. Meyer left for some reason, and left the matter for Mr. Rowe to sign for himself. . . . He told Mr. Rowe to act and sign for him and for Rowe himself. It was left with Rowe to finally execute the paper.''

The paper mentioned—the parts not bearing upon this case omitted—is as follows:

''This agreement, made this 31st day of October, 1899, by and between H. W. Hardinge, of Denver, Colorado, party of the first part, and August R. Meyer and Bernard D. Rowe, both of Kansas City, Missouri, parties of the second part: Witnesseth: Whereas, said H. W. Hardinge is the owner of twenty (20) shares of stock in the Meyer-Clarke-Rowe Mines Company, a corporation under the laws of Missouri; and whereas, said August R. Meyer and Bernard D. Rowe own a majority of the capital stock of said Meyer-Clarke-Rowe Mines Company; and whereas, said Hardinge is willing and desirous of transferring said twenty (20) shares of stock to said Meyer and Rowe in consideration of their transfer to him of an undivided one-twentieth (1-20th) interest in certain contracts hereinafter more specifically set forth: . . . Now, therefore, said H. W. Hardinge, in consideration of one dollar ($1.00) to him in hand paid, and of the covenants and agreements towards him to be performed by said Meyer and Rowe, as hereinafter set forth, and the release of said Hardinge from all liability as a former stockholder in said M.-C.-R. Mines Co., doth hereby sell, assign, transfer and deliver unto the said August R. Meyer and Bernard D. Rowe, twenty (20) shares of the capital stock of the Meyer-Clarke-Rowe Mines Company, as is further evidenced by his indorsement on said certificate of stock for said twenty (20) shares heretofore issued to said H. W. Hardinge, and now in possession of said Meyer-Clarke-Rowe Mines Company.

''And in consideration of above transfer of said twenty (20) shares, said Meyer and Rowe do hereby transfer and assign to said H. W. Hardinge an undivided one-twentieth (1-20th) interest (subject, however, to the control, handling and disposal by said Meyer and Rowe of such contracts as in their judgment shall seem best for all concerned), in two certain contracts, one between Brewster Cameron and L. H. Manning and said Meyer-Clarke-Rowe Mines Company, dated

January 3rd, 1899, and the other a certain lease from the San Xavier Mining Company, of Boston, Massachusetts, to said Manning and Cameron, and by them assigned to said Meyer-Clarke-Rowe Mines Company, dated January 10th, 1899, and should said Meyer-Clarke-Rowe Mines Company elect under above contract of January 3rd, 1899, and under said lease of January 10th, 1899, to complete the payments to said Cameron and Manning, and to the said San Xavier Mining Company, as in said contracts provided, said Hardinge shall be entitled, without further payment by him of any sum, to an undivided one-twentieth (1-20th) interest in all the rights that the Meyer-Clarke-Rowe Mines Company may hereafter acquire in the mining properties in said two contracts described, and as provided by the terms of said two contracts, together with an option with L. H. Manning on the Ruby claim. . . .

"In witness whereof, parties of the first and second part have signed and sealed two copies of this agreement, one to be retained by each of the parties hereto.

" [Signed]                   H. W. HARDINGE.
                     "AUGUST R. MEYER,
                             "By BERNARD D. ROWE.
                     "BERNARD D. ROWE."

Recorded April 22, 1904, Book 7, Miscel. Records, p. 196.

The plaintiff offered in evidence a letter dated April 17, 1900, addressed to himself and signed by August R. Meyer. Plaintiff testified that this letter was received by him and was in answer to a letter which he had sent to Mr. Meyer concerning the property in question. Counsel for plaintiff stated in connection with the offer, and in reply to an objection to its receipt in evidence, among other things, as follows:

"I think it tends to show the intention of the parties in that contract that is in evidence."

It was conceded that Mr. Meyer died in December, 1905. The copy of the letter written by plaintiff to Mr. Meyer was not available at the trial. The letter was produced and examined by defendant's counsel, and all objections thereto were withdrawn. The material part of the letter following the heading and date is as follows:

"Mr. H. W. Hardinge, Denver, Colo.

"Dear Sir: Your favor of the 21st of March has not been answered . . . because it was my expectation that I should be able to discuss the letter with you while at Denver.

"Not having had the opportunity of discussing matters with you, I now beg to say, in reply to the two principal propositions contained in your letter of the 21st of March, as follows:

"Mr. Rowe and I have been of late engaged in negotiations which now promise to assume shape, and there is a possibility that we may find a purchaser for the San Xavier property. Under the circumstances, we cannot give you any contract.

"In regard to the other matter mentioned in your letter, namely, the statement attributed to me that every member of the Meyer-Clarke-Rowe Mines Company was at liberty to call in outside financial assistance to carry his interest in that Company, I have to say, that I am very much surprised that you should again bring up what has been long disposed of. In our meeting at the Brown Palace Hotel, to which you make reference, I stated that at the time when the Meyer-Clarke-Rowe Mines Company was heavily indebted to banks here, and furthermore, had hanging over it very considerable obligations to Mr. Manning, which had to be met, or everything so far invested had to be lost, that if you were not able to carry your part of the obligation we should not object to having you find your own assistance through friends or otherwise, to take care of your share instead of doing so with the rest of us through banks. You have never made use of this privilege, and the obligations against the company finally coming to a head, it became necessary either that every member of the company assume his share of the then existing obligations, or dispose of his interest. You disposed of your interest in the Meyer-Clarke-Rowe Mines Company under conditions which were more liberal to you than the situation warranted. If Mr. Rowe and I had insisted upon a settlement it would have been entirely right and proper that in return for assembling all of the obligations, which at the time were considerable, we should receive the entire property. Instead of that you have been given a 5% unassessable interest, and therefore the whole matter is closed. I must confess to considerable irritation in having you constantly bringing up old

matters, long ago disposed of. What your object can be it is impossible for me to understand.

"The situation now is that Mr. Rowe and I have purchased your interest in the Meyer-Clarke-Rowe Mines Company. We have also purchased all of the interests of Mr. Clarke, and the interest of Mr. Murray. Both of these gentlemen were unable or unwilling to continue the San Xavier enterprise. The fact is that Mr. Clarke's interest was purchased for the amount of money he had put in, so that he sold at less favorable terms than you, although he sold before you sold. We have given you, in order to show the utmost fairness, 5% unassessable interest in the San Xavier.

"Should we succeed in disposing of the San Xavier property, your interest will of course be considered, and in accordance with our contract we shall sell your interest as our own, at the same rate that we sell our own.

"Yours truly,

"AUGUST R. MEYER.

"P. S.—This also replies to your letter of the 5th of April to Mr. Rowe."

Under date of November 21, 1900, plaintiff wrote a letter to B. D. Rowe, as secretary of the Meyer-Clarke-Rowe Mines Company, stating in part:

"While Mr. Meyer was in Denver last week he mentioned that he thought you had written to me in relation to the San Xavier, that you were contemplating a sale or transfer of the property. I informed him that according to the terms of the agreement I did not apparently have control of my interest, a fact he apparently did not understand, or I will say had forgotten."

On October 27, 1902, the Meyer-Clarke-Rowe Mines Company consented to give plaintiff an option to sell the San Xavier mines on the lines discussed 18 months prior. This was evidenced by the records of the company and, on November 29, 1902, a letter reading as follows:

". . . We have this date given you an option upon the San Xavier mines, near Tucson, Ariz. In the event that you shall take up the option and dispose of the property at the price under the option stated, we agree to pay you one-fifth ($\frac{1}{5}$) of the proceeds of said sale; payments to be made to you

XVII Ariz.—6

according to your proportion as installment payments are made to us. This one-fifth (⅕) share in the proceeds of the sale, as under the option given you this date, shall be in lieu and in full discharge of all commissions, services and shall include a full discharge of your present interest in said property.

"In the event no sale be made, your interest in the property will be as it is at this time."

"[Signed]        THE    MEYER–CLARKE–ROWE    MINES COMPANY,

"B. D. ROWE,
"Secretary and Treasurer."

The counsel stipulated in the record as a fact that the Meyer-Clarke-Rowe Mines Company conveyed the property herein involved to the Arizona-Parral Mining Company, and the Arizona-Parral Mining Company conveyed it to the Empire Zinc Company by deeds, on their face carrying the record title. Plaintiff introduced, under objections, an entry in the minutes of the Meyer-Clarke-Rowe Mines Company, made under date of July 23, 1906, at a special directors' meeting, a resolution adopted, stating:

"That the president and secretary of this company be and they are hereby authorized to make a contract for the sale of the San Xavier properties near Tucson, Arizona, at a net price to this company, of not less than $200,000—on such terms as they deem wise and to make, execute and acknowledge in behalf of this company warranty deed to above mining properties for delivery when deemed best by said officers."

Under the authority of this resolution plaintiff offered two unsigned documents in the form of deeds purporting to convey the mines to "blank," as party of the second part. The parties of the first part are named as the Meyer-Clarke-Rowe Mines Company and H. W. Hardinge. Plaintiff testified that the instruments were sent to and received by him; that he filled in the name of one William V. Hodges as the party of the second part; that he signed and acknowledged the deeds as one of the parties of the first part, and returned the instrument so signed to Mr. B. D. Rowe as president of the Meyer-Clarke-Rowe Mines Company. The deeds were never executed by the Meyer-Clarke-Rowe Mines Company, nor delivered to take effect as a deed. The deed was prepared for

delivery in case a sale was made to Hodges. The purpose of the offer was stated to be:

"I offered it simply for the purpose of showing that, when they were undertaking to sell that property, they prepared and sent to Mr. Hardinge, as one of the vendors, one of the deeds to sign it, as a recognition of his interest."

The deal fell through. Witness (plaintiff) never saw the document after he signed and acknowledged it and sent it to Mr. Rowe. A number of items were offered by plaintiff for the purpose of proving notice to the defendant of plaintiff's claim to an interest in the mines. The evidence so offered was rejected for various reasons.

The Arizona-Parral Mining Company was organized in November, 1909, and Mr. Rowe was president until 1911. It was admitted in open court that the mines in suit were conveyed by the Meyer-Clarke-Rowe Mines Company by warranty deed to the Arizona-Parral Mining Company; that thereafter the Arizona-Parral Mining Company conveyed the mines by warranty deed dated November 16, 1912, to the Empire Zinc Company, which deed was recorded. "It is admitted that the title in all these properties, that is, the legal title, is vested in the defendant by grant from the United States government in the form of United States mining patents, and by mesne conveyances from those to whom these patents were issued. This is only to show that the title is held straight from the United States government to the Empire Zinc Company."

At the close of the plaintiff's case the defendant moved "to exclude from the consideration of the jury and from this cause all testimony that has been introduced concerning the alleged contract of October 31, 1899, between Meyer and Rowe on the one hand, and Hardinge, the plaintiff, on the other hand, all evidence concerning matters relating to that contract or any rights claimed to have been acquired under it, or by reason of it, and all evidence that has been offered and received by the court over the objection of the defendant, subject to further consideration by the court; the objection having been made in general terms, but having been understood as being directed to the incompetency, irrelevancy and immateriality of the offered testimony, and only admitted by the court because of the avowal of the plaintiff's attorney of

certain things that he would establish by competent testimony, and particularly, for the reason that the plaintiff has failed to make good the avowal of the plaintiff's attorney as to the matters which he would show by competent testimony. He has failed to show notice to the Empire Zinc Company, the defendant in this case, of any matter which would substantiate the claim of the plaintiff to the undivided one-twentieth interest which he seeks in this action. He has failed to show that the Empire Zinc Company received any notice that this alleged contract of October 31, 1899, was ever in existence, or that it was ever recorded. The record of the instrument . . . gave no notice to anyone. The plaintiff has failed to show any corporate action of the Meyer-Clarke-Rowe Mines Company ratifying and confirming this alleged contract of October 31, 1899, as he promised and avowed that he would do. The plaintiff has failed to show that the defendant in this case . . . ever had any notice of any corporate action of the Meyer-Clarke-Rowe Mines Company ratifying this alleged agreement of October 31, 1899, as the plaintiff in his offer and avowal at the opening of the case . . . stated to the court that he would do. For the reason that all the testimony so offered and so conditionally accepted by the court and permitted to be given, including all the exhibits in the form of letters, are incompetent, immaterial and irrelevant, and insufficient to any issue presented in this case for determination.''

The motion was granted by the court. Defendant thereupon moved for a directed verdict, which motion was granted. The jury returned a verdict for the defendant as directed by the court. The court entered judgment for the defendant upon the directed verdict. The plaintiff moved for a new trial, which motion was denied and a new trial refused. Plaintiff gave notice of appeal from the judgment and from the order refusing a new trial.

Mr. Eugene S. Ives and Mr. Gerald Jones, for Appellant.

Mr. S. L. Kingan, Messrs. Ashley & Gilbert, and Mr. E. C. Stimson, for Appellee.

CUNNINGHAM, J.—The appellant assigns as error the order granting the motion excluding the testimony condition-

ally admitted under an avowal of plaintiff; in rejecting other evidence offered; in directing the jury's verdict; and in refusing a new trial.

The action is one in its nature the statutory action to quiet and establish title in the plaintiff to an undivided one-twentieth interest of, in and to the San Xavier group of mines in the possession of the defendant, held by an unbroken chain of record title from the sovereign of the soil.

The title asserted by the plaintiff is claimed to be equitable in its nature, and arose from a certain transaction concluded between August R. Meyer and Bernard D. Rowe upon the one part and plaintiff on the other part, and was reduced to writing, executed and delivered on the thirty-first day of October, 1899. In support of his title plaintiff introduced the said paper writing, hereinafter referred to as "the contract of October 31, 1899." He also offered certain letters, minute entries of corporation records, and other oral and documentary testimony tending to show that his claim of title to said undivided share, specified in said contract, was recognized by the party holding the paper title, or that the subsequent purchaser had notice and full knowledge of plaintiff's claim before purchasing such property.

At the time the contract of October 31, 1899, was made, the Meyer-Clarke-Rowe Mines Company, a Missouri corporation, held, as was termed by the witnesses, "an option on an option" and lease standing in the names of L. H. Manning and Brewster Cameron, and an option to purchase the Ruby claim from L. H. Manning. The option and lease upon which the Meyer-Clarke-Rowe Mines Company held an option ran from the San Xavier Mining Company, the owner of the mines, except the Ruby, to Manning and Cameron dated January 10, 1899, and assigned to Meyer-Clarke-Rowe Mines Company. The contract from Manning and Cameron to Meyer-Clarke-Rowe Mines Company bore date of January 3, 1899, and purported to assign the Manning and Cameron contracts and lease to the Meyer-Clarke-Rowe Mines Company. The Meyer-Clarke-Rowe Mines Company was thereby and in that manner connected with the title to the mines when the contract of October 31, 1899, was made with plaintiff. The duties required of the Meyer-Clarke-Rowe Mines Company, by its contracts and options, before its right to a conveyance

of title matured, do not clearly appear from the record, but the parties concede, or do not controvert the fact, that the Meyer-Clarke-Rowe Mines Company did, after the date of October 31, 1899, the date of the contract with Hardinge, perform those required duties and received conveyances of the titles to all the mines in question, and that such conveyances' were received under the terms of and pursuant to the said optional contracts. It was stipulated on the trial that the Meyer-Clarke-Rowe Mines Company conveyed the mines by warranty deed to the Arizona-Parral Mining Company, a corporation organized in 1909, and that corporation conveyed the mines by warranty deed to the defendant Empire Zinc Company, on November 22, 1912, for a consideration of $175,000, cash paid. All of said deeds of conveyances were duly of record.

The contract of October 31, 1899, under which plaintiff claims to have derived his equitable title, was executed by August R. Meyer and Bernard D. Rowe. It does not purport to have been signed by the Meyer-Clarke-Rowe Mines Company acting in its corporate capacity; but appellant contends that Meyer and Rowe were the controlling stockholders of said corporation and officers of the corporation; that the contract was a result of a conference held by all of the stockholders and all of the officers of the corporation, and was in fact the contract of the corporation and so regarded by all the parties, stockholders and officers. The view we have taken of the record justifies us in conceding, for the purposes of this opinion, that such effect may be given the evidence in the record—that is, that the contract of October 31, 1899, signed by August R. Meyer and Bernard D. Rowe, was in fact the contract of Meyer-Clarke-Rowe Mines Company, and not the contract of Meyer and Rowe whose names appear signed thereto—that in signing the instrument they were signing it as agents, and inadvertently signed their individual names, instead of signing the name of their principal, the corporation. If the contract of October 31, 1899, be not considered the contract of the corporation, but the contract of Meyer and Rowe, whose names are signed to it, then, of course, plaintiff acquired no interest in the title to the property involved through such contract. The record here raises the questions involved upon a motion to exclude the evidence because it is

incompetent, as well as irrelevant and immaterial; and, as to its competency and sufficiency to establish a fact for which the evidence is offered, the appellant is entitled to the benefit of every inference favorable to its competency that may be legally drawn from the evidence excluded. For this reason we will treat the said contract as the contract of the corporation, for all purposes of this opinion.

The rights which Hardinge received were transferred and assigned to him by the following paragraph of the contract of October 31, 1899, viz.:

"And in consideration of above transfer of said twenty (20) shares, said Meyer and Rowe do hereby transfer and assign to said H. W. Hardinge an undivided one-twentieth (1-20th) interest (subject, however, to the control, handling and disposal by said Meyer and Rowe of such contracts as in their judgment shall seem best for all concerned), in two certain contracts, one between Brewster Cameron and L. H. Manning and said Meyer-Clarke-Rowe Mines Company, dated January 3rd, 1899, and the other a certain lease from the San Xavier Mining Company, of Boston, Massachusetts, to said Manning and Cameron, and by them assigned to said Meyer-Clarke-Rowe Mines Company, dated January 10th, 1899, and should said Meyer-Clarke-Rowe Mines Company elect under above contract of January 3rd, 1899, and under said lease of January 10th, 1899, to complete the payments to said Cameron and Manning, and to the said San Xavier Mining Company, as in said contracts provided, said Hardinge shall be entitled, without further payment by him of any sum, to an undivided one-twentieth (1-20th) interest in all the rights that the Meyer-Clarke-Rowe Mines Company may hereafter acquire in the mining properties in said two contracts described, and as provided by the terms of said two contracts, together with an option with L. H. Manning on the Ruby claim."

The provision may be said to be obscure or ambiguous in the particular of the clause: "(Subject, however, to the control, handling and disposal by said Meyer and Rowe of such contracts as in their judgment shall seem best for all concerned)."

Whether said limiting clause refers to the then existing interest of Meyer-Clarke-Rowe Mines Company in the con-

tracts in their executory condition, alone, or whether the limiting clause was intended to refer to the interest then existing in such contracts as long as they remained executory, and also to the interest of Meyer-Clarke-Rowe Mines Company, after the said contracts were executed by performance, and the titles to the mines became vested in Meyer-Clarke-Rowe Mines Company pursuant to the terms of the contracts. If the limiting clause had reference to the interest as it then existed, and prevented Hardinge from exercising any control over, and from handling, and from disposing of, the one-twentieth interest transferred and assigned to him by the instrument, then when the subsequent condition arose—when the Meyer-Clarke-Rowe Mines Company completed the payments pursuant to the contracts, and received the titles to the mines—the limiting clause had nothing upon which to operate and became meaningless. The limiting clause and all reference to the interest affected thereby could be eliminated from the provision without in the least affecting its meaning. So eliminating such provision, after the Meyer-Clarke-Rowe Mines Company acquired the conveyance of title to the mines pursuant to the said contracts, the provision would read as follows:

"And in consideration of above transfer of said twenty (20) shares, said Meyer-Clarke-Rowe Mines Company does hereby transfer and assign to said H. W. Hardinge an undivided one-twentieth interest in all rights that it has acquired in the mining properties described in the two certain contracts [describing them] pursuant to such contracts, together with an option with L. R. Manning on the Ruby claim."

So interpreted, the instrument would have the legal effect of conveying an undivided one-twentieth interest in all the rights the Meyer-Clarke-Rowe Mines Company owned in the mining properties acquired by it pursuant to the said contracts. On the other hand, if the limiting clause was intended to have reference: First, to the existing rights in the contracts, as long as the contracts were executory, and, second, when they were executed and through their execution other rights were acquired, then, to have reference to such after-acquired rights—it follows that when the Meyer-Clarke-Rowe Mines Company did acquire the titles to the mines, by completing

the payments, the provision should and must be interpreted
to mean as if reading as follows.:

"And in consideration of above transfer of said twenty
(20) shares, said Meyer-Clarke-Rowe Mines Company does
hereby transfer and assign to said H. W. Hardinge an undi-
vided one-twentieth (1/20th) interest (subject, however, to the
control, handling and disposal by said Meyer-Clarke-Rowe
Mines Company of such interest as in its judgment shall seem
best for all concerned) in all the rights that it acquired in
the mining properties pursuant to two certain contracts [de-
scribing them], together with an option with L. H. Manning
on the Ruby claim."

The limiting clause as written qualifies the right of Har-
dinge to control, handle or dispose of the interest transferred
and assigned to him by the contract.    Does it also qualify and
limit Hardinge's right to control, handle and dispose of the
interest transferred and assigned to him through and by the
completion of the payments under the contracts of option and
lease?    What was the intention of the parties in that re-
spect?    What was the construction placed upon the contract
by the parties?    Was that construction in favor of the right
of Hardinge to handle, control and dispose of his interest, or
against that right?    August R. Meyer's letter of April 17,
1900, introduced by plaintiff under the statement, "I think it
tends to show the intention of the parties in that contract
that is in evidence," bears on this question as stated by plain-
tiff.    After stating the causes and circumstances leading up
to the making of the contract substantially as recited in the
contract, he states:

"Instead of that you have been given a 5% unassessable
interest, and therefore the whole matter is closed. . . . The
situation now is that Mr. Rowe and I have purchased your
interest in the Meyer-Clarke-Rowe Mines Company. . . . We
have given you, in order to show the utmost fairness, 5%
unassessable interest in the San Xavier.    Should we succeed
in disposing of the San Xavier property, your interest will
of course be considered, and *in accordance with our contract
we shall sell your interest as our own, at the same rate that
we sell our own.*"

This is an express construction of the contract by Mr. Meyer
about five months after the contract was signed.    His con-

struction was that Hardinge's interest could be sold by Meyer and Rowe, and Hardinge had no right to control the sale. Under date of November 21, 1900, Mr. Hardinge wrote a letter addressed to B. D. Rowe, secretary of the Meyer-Clarke-Rowe Mines Company, stating:

"While Mr. Meyer was in Denver last week he mentioned that he thought you had written to me in relation to the San Xavier, that you were contemplating a sale, or transfer of the property. I informed him *that according to the terms of the agreement I did not apparently have control of my interest, a fact he apparently did not understand, or I will say had forgotten. . . .*"

This letter was offered by the defendant and received in connection with the cross-examination of the plaintiff. We refer to it in this connection only as a means of arriving at a true construction of the contract, as a construction placed upon the contract by the plaintiff. We thereby have both parties to the contract of October 31, 1899, construing it to mean that such interest as said contract conveyed to Hardinge the right to control, handle and dispose of it was withheld, and retained by the Meyer-Clarke-Rowe Mines Company or Meyer and Rowe.

The above evidence is not all the evidence in the record indicating the same construction was at all times given the contract by the parties. Until shortly before the defendant Empire Zinc Company acquired the property the plaintiff placed no other construction upon it. In view of such fact, and the purpose for which the contract was made, and the circumstances surrounding the making of the contract, and the words of the contract, all considered, we have no hesitancy in expressing the opinion that it was the purpose and intention of the parties, by the contract, to secure to plaintiff one-twentieth interest in the property asset, and they had no intention of conveying to him any interest in the title to the asset, the mines. The evident purpose was to withhold from Hardinge the right to control and dispose of the one-twentieth interest in the assets of the corporation, transferred and assigned to him, and that it was at no time the purpose or intention of the parties to give to the contract the effect of a conveyance of title to the property described. The contract which, on the one hand, "transfers and assigns" an estate

in property, and on the other hand withholds from the transferee or assignee all right of control over the property, and all right of disposal of the property, is lacking in the elements of a sale or transfer of title, and vests no rights of ownership of title in the transferee, for the reason one who has no right to control, handle or dispose of a thing cannot be considered its owner, for the essential attributes of ownership of property, real and personal, are the rights in the owner to control, handle and dispose of the thing owned. *Converse* v. *Kellogg,* 7 Barb. (N. Y.) 590; *Hill* v. *Cumberland Valley Mut. Protection Co.,* 59 Pa. (9 P. F. Smith) 474.

The contract so construed and interpreted is no evidence of ownership of the title in the plaintiff, whatever rights it otherwise conveyed to him. Therefore, in this action to quiet title, that contract is no evidence of title in the plaintiff.

The rule is that plaintiff must succeed only on the strength of his own title, and not on the weakness of the title of his adversary. 32 Cyc. 1329. It is sufficient *prima facie* if complainant makes out a title apparently good as against defendant. 32 Cyc. 1372. Plaintiff did neither. He offered no evidence of paramount title in himself, but on the other hand, the title of the defendant was conceded to consist of a regular chain of title from the sovereign of the soil to the defendant.

The questions of notice to the purchaser are not involved. If defendant had actual notice of the contract of October 31, 1899, that notice only bound the defendant to take notice of the legal effect of the contract, and that effect was as above stated. Its terms did not affect the title to the mines.

The court committed no error in rejecting the evidence because of its incompetency and insufficiency to show title in plaintiff. Likewise the court correctly directed the jury to find for the defendant, because there was no evidence before them upon which a verdict for the plaintiff could be based. The judgment following the verdict was proper. To discuss the other questions raised would serve no useful purpose.

The judgment is affirmed.

ROSS, C. J., and FRANKLIN, J., concur.