## Case No. 4,855.

### Ex parte FLANNAGANS.

### In re CHAMBERLAINES.

[2 Hughes, 264; [1] 12 N. B. R. 230; 14 Am. Law Reg. (N. S.) 688; 4 Am. Law Rec. 304.]

District Court, E. D. Virginia. May 7, 1875.

---

[1] [Reported by Hon. Robert W. Hughes. District Judge, and here reprinted by permission.]

W. W. Old, for petitioners.
John S. Tucker, for assignee.

HUGHES, District Judge. The questions to be decided are these, viz.: 1st. Were the shipments of this fertilizer under the contract of December 6th, 1872, a mere consignment on a del credere guarantee, or were they on sale? 2d. If on sale, did the shipments pass the whole property in the fertilizer to the Chamberlaines, or was there a special property reserved constituting in favor of the Flannagans a preferred claim upon the proceeds of the fertilizer in the hands of the Chamberlaines?

1st. It is clear that the contract of December 6th, 1872, did not provide for consignments to the Chamberlaines as ordinary factors, for sale on the usual commissions. Nor did it provide for consignments upon the ordinary del credere commission of guarantee. Had it done either of these things, the well-settled law, either of simple or del credere agency, would have clearly determined the rights and liabilities of the parties.

But these consignments were not made upon any sort of implied contract. They were made upon an express contract, definite in terms, written and mutually signed. We cannot therefore go out of such a contract to the law of general consignments, or of del credere agencies, to ascertain the rights and liabilities arising from their own stipulations, of these parties. It is only when there is no special contract that the general law of agency applies between consignor and consignee; for it is always competent for persons in this relation to contract according to their pleasure, and thus vary or restrict, or enlarge, the general liabilities implied by the law in absence of express contract. Story, Ag. § 334.

What were the provisions of the contract of December 6th, 1872? The Chamberlaines were to be responsible for all the sales of the fertilizer which they should make. They were to be themselves primarily responsible. They were to discharge this responsibility by acceptances payable at sight or on short time as to part, and at a future day as to the residue of the price of the fertilizer. They were to have a commission of ten per cent., not on their own sales, but on the price of the article fixed in advance by the consignors. They were, at the end of the season of business, to be credited with so much of the article as should then remain on their hands. They were not to charge storage upon the fertilizer, but if any of it remained on hand after the season was over, they were then to be entitled to storage on such surplus. In the contract, the terms "agency," "guarantee," and "commission" are used, implying that the parties considered that in the transac-tions about to be made they should hold the relation to each other of principal and agent.

The question is whether this contract constituted the Chamberlaines purchasers of the fertilizer, or merely agents for its sale on a del credere guarantee. If the contract in its terms really constituted them purchasers, the use of words implying that they were agents does not change the fact. "Persons may suppose that their relationship is that of principal and agent, when in point of law it is not." Ex parte White, In re Nevill, 6 Ch. App. 403. If the consignments were a sale, they were a final sale as to the portion of the fertilizer which should be disposed of during the season by the Chamberlaines; and, as to the portion remaining over at the end of the season, they were consignments on "sale or return."

Upon the authority of the case of Ex parte White (In re Nevill), above cited, and of section 215, Story's Agency, about to be referred to, I think the consignments were a sale, and not a shipment on a del credere guarantee. For here the obligation of the Chamberlaines to pay for the fertilizer at a fixed price, and a fixed time, was clearly established by the contract. They were primarily liable to the Flannagans for the fixed price on their acceptances. They might sell to planters at a different price so far as the obligation imposed by the contract was concerned. If the planters were to be liable to the Flannagans at all, they were to be so only secondarily. The Flannagans looked to the Chamberlaines only, and did not know the planters in the whole transaction.

The now well-settled law of del credere guarantee is that the factor is not the primary debtor; that his engagement is merely to pay the debt if it is not punctually paid by the person to whom he sells; that he stands more in the character of a surety than a debtor; and that he is not liable to pay the debt until there has been default by the person who buys from him. Story, Ag. § 215, citing numerous English and American cases. Can it be pretended that the stringent contract of December 6th left the Chamberlaines in the secondary and optional relation to the Flannagans thus described, in respect to the article which they paid for as it arrived with their acceptances? Lord Justice Melish, in Ex parte White (In re Nevill), distinguishes between consignments on del credere guarantee and those on sale in the following explicit language: "If the consignee is at liberty to sell at any price, and to receive payment at any time he likes, but is bound, if he sells the goods, to pay the consignor for them at a fixed price and at a fixed time, in my opinion, whatever the parties may think, their relation is not that of principal and agent. The contracts of sale which the consignee makes with the persons who purchase from him are not contracts made on account of his principal, for he is to pay a price which may

be different, and at times which may be different from those fixed by these contracts. He is not guaranteeing the performance by the persons to whom he sells, of their contract with him, which is the proper business of a del credere agent; but he undertakes to pay a certain fixed price for the goods, at a certain fixed time, to his principal, wholly independent of what the contract may be which he makes with the persons to whom he sells; and my opinion is that, in point of law, the alleged agent in such a case is making, on his own account, a contract of purchase with his alleged principal, and is again reselling."

The Flannagans themselves treated the consignments as a sale to the Chamberlaines. After the acceptances, which they received under the contract of December, 1872, had matured, and been protested, they did not treat the Chamberlaines as their debtors on open account, in the direct character of guarantors of the sales which had been made to planters, but they treated them as directly indebted on the acceptances which remained unpaid. If the Chamberlaines had been guarantors only, their liability would not have been fixed until after proper means of collecting the dues from planters had been exhausted. But the Flannagans declined to look to them in that character. They treated them as already indebted, and dealt with the unpaid acceptances as the evidence of their indebtedness.

Even supposing the Flannagans, by the terms of the contract of December, 1872, to have reserved for themselves the option of treating the Chamberlaines either as agents or as purchasers at pleasure, yet, by the contract of January, 1874, they availed themselves of this option, and did elect to treat them as purchasers; for they accepted a novation of new acceptances in place of the old ones for the whole value of the fertilizer not yet paid for. It is true that the Flannagans did, to the latter contract providing for the novation, append a clause in the following words, viz.: "It being understood and agreed that such collections are held by Chamberlaine as agent only, and belong properly to the payment of said acceptances, having sold as agent with his guarantee of payment." But the most that can be claimed for this stipulation in determining the question whether the consignment was upon purchase or guarantee, is that it preserved to the Flannagans the option of electing afterwards, and a second time, whether to rely upon the new acceptances for payment of the moneys due them, or to resort to the notes and accounts due from the planters. Supposing this right of choosing between these alternatives to have been reserved, still, even in that case, the choice of the Flannagans, thus reserved, was made in the summer of 1874, when, instead of going against the planters as first liable to them before the Chamberlaines were so

as guarantors, they ignored the planters, and brought suit against the Chamberlaines on their acceptances.

If the Chamberlaines were liable as purchasers, then the Flannagans had a right to sue them on their acceptances. If they were not liable as purchasers, but only as guarantors, then they could have been sued only after the remedy against the planters had been exhausted, on open account.

Upon the whole case, therefore, I am of opinion that not only did the contract of December, 1872, and the transactions of 1873 under it, make the Chamberlaines purchasers instead of agents, but the Flannagans, in the contract of January, 1874, and in the suit brought in the summer of that year, themselves elected to treat them as such, and committed themselves to that view of the contract.

It may be admitted that if the terms used in the writing of January, 1874, had been employed in that of December, 1872, it would have been difficult to resist the conclusion that the consignments made under it were to the Chamberlaines as agents and not as purchasers. But the second contract came too late to have any effect upon the dealings. If the original paper of December, 1872, provided for a sale, and the transactions under it were those of sale and purchase, then the contract of January, 1874, made after all the dealings were over, could not, by any language put into it, change their character already fixed and determined. Nor could the agreement of the Chamberlaines in January, 1874, to apply their collections from the planters to the payment of the acceptances, change the previously fixed fact that they were purchasers, if they really were so. That agreement was a merely voluntary one to comply with an obligation of honor.

2d. Having concluded that the consignments of the Flannagans to the Chamberlaines were made to the latter in the character of purchasers, and not of agents, it is next to be inquired whether the sale was absolute or qualified. The principle of the leading case of Jenkyns v. Brown, 14 Q. B. 496, is that when a consignment is made, and bills of exchange are drawn for the value and bills of lading are sent to a third person to be delivered on payment of the bills of exchange, a sale is made, in which a general property passes to the consignee, and a special property is reserved by the consignor until the payment of the value. In other words, a sale may take place on a consignment, although a special property in the thing consigned be reserved by the consignor.

In the leading case of the Bank of Ireland v. Perry, L. R. 7 Exch. 14, it is decided that where a consignor reserves a special property in the goods consigned, that special property follows the goods in favor of the holder of bills of exchange drawn against them, when the consignee goes into bank-

ruptcy or composition. The principle on which the bill-holder is allowed the benefit of this special property, as against other creditors of the insolvent, is explained by Bispham, in his recent tract on Contracts in Rem, to be that under the original consignment a jus in rem in the goods is acquired by contract, as against the world, by the drawer of the bills in favor of himself and the persons holding the bills for him; and, that being a jus in rem against the world, this special property follows the goods into the hands of assignees or trustees of an insolvent consignee. If this principle be not yet conceded in courts of law, it fully obtains in courts of equity, and must be applied in this court.

I think that the intention of the Flannagans to reserve a special property in the proceeds of the fertilizer sold by the Chamberlaines to planters is too plain to be denied. But was that intention effected? The principle of the two cases just cited is that the consignor may reserve a special property in the goods consigned, for the protection of bills which he himself draws against the goods; but they do not go so far as to hold that he may reserve a special property in favor of himself in bills which his consignee may draw upon sales of the goods which the consignee shall make. Courts of law have scarcely yet recognized the principle of the cases of the Bank of Ireland v. Perry, above cited, and of Ex parte Waring, 19 Ves. 345, and courts of equity have not advanced so far as to allow the original consignor to bind the proceeds of goods after they have been received by the consignee and sold to second consignees or purchasers. The law would have allowed the Flannagans to bind the goods in favor of the holder of the drafts drawn by themselves, but it would not follow the sale of the goods by the Chamberlaines and bind in favor of the Flannagans the notes and accounts taken by the Chamberlaines. If the Chamberlaines were not acting in their own right and were responsible, the concluding clause of the contract of January 7th, 1874, would bind undoubtedly the notes and accounts due from the planters in favor of the Flannagans as against the Chamberlaines. But the bankruptcy of the latter has thrown these notes and accounts into the hands of their assignee, subject to the rights of other creditors; and it would be carrying the doctrine of jus in rem too far to hold that the Flannagans have a special property in those notes and accounts, as against general creditors. I am bound to decide, therefore, that the Flannagans have no special property in the notes and accounts due from planters for the fertilizer sold by the Chamberlaines, and that these choses in action are part of the general assets in this cause.