[Civ. No. 5781. First Appellate District, Division One.—December 19, 1927.]

JAMES E. REITER, Appellant, v. O. B. ANDERSON et al., Respondents.

Edward J. Jose for Appellant.

Louis Oneal for Respondents.

KNIGHT, J.—Plaintiff brought this action to recover the purchase price of certain sewing-machines alleged to have been sold to defendants by plaintiff's assignor, the Standard Sewing Machine Company. The evidence shows without dispute that the machines were ordered and received by defendants, and that they were not paid for. But defendants claimed and the trial court found that the machines had been shipped to defendants on consignment, under the terms of a written contract of agency which was later terminated by defendant and the machines stored subject to the company's disposal; that therefore the transaction did not constitute a sale. Judgment was rendered accordingly in defendants' favor, and plaintiff appealed.

■ The determination of the question as to whether the transaction constituted a sale or a consignment depends principally upon the legal construction which shall be placed upon the contract and the order for the goods given in pursuance of the contract. The essential portions of the contract, which is dated April 16, 1925, were as follows: "Whereas, Party of the Second Part (defendants herein) is desirous of obtaining the agency of Standard Sewing Machines in the following territory, to-wit: Santa Clara County. Party of the Second Part agrees to maintain a store in the above mentioned territory and to diligently work in the sale of Standard Sewing Machines and Standard Products. *The Party of the Second Part hereby agrees to purchase from the Party of the First Part not less than 144 machines per year, or 12 each calendar month,* shipments to be made to said Party of the Second Part f. o. b. Cleveland, Ohio, at the regular wholesale price listed at the factory at the time and date of shipment. In case Party of the Second Part orders machines shipped from San Francisco, or any other point other than factory, Party of the Second Part hereby agrees to pay freight and drayage costs incurred by Party of the First Part. The Party of the Second Part further agrees to sell or resell all Sewing Machines at the regular retail price established by Party of the First Part, excepting Party of the Second Part has the privilege of making discounts for cash or short time payments and has the privilege of making any allowances on machines or other articles traded in. Under no conditions will the Party of the Second Part be allowed to advertise in newspapers, periodicals, magazines, or in any other way advertise anything but the retail list price as aforesaid mentioned." Then followed a schedule of prices under which the machines were to be sold, the sewing-machine company reserving the right to change the same at any time. Continuing, the contract provided: "No other contract, either verbal or written, other than that which is written or printed herein will be recognized by the Party of the First Part, and we hereby agree to all of the conditions as set forth in the above. This agreement shall be in effect from the date first above written until written notice of thirty days shall be given by either party to the other, to terminate same."

The order for the goods bears the same date as the contract, and was apparently executed as part of the same transaction. It was addressed to said company, signed by defendants, and read as follows: " . . . Please ship at once the following sewing machines, *for which we agree to pay according to prices, terms and conditions given herein,* subject to your approval. . . . *2% Discount 30 days or 60 days Net.* . . . Upon receipt of freight bill with Railroad agent's notation of any damage thereon, you are to replace prepaid and without charge all parts which may become broken in transit. 'Rotary' machines, manufactured under your United States Patents, we agree to sell, . . . at retail, to intending users, and according to your schedules and instructions. The above is an exact statement of the terms agreed upon as per order above; and it is fully understood and agreed that no claims or demands on account of any promise, either verbal or written, or any agreement of any kind whatever, outside of this order, will or can be made; the undersigned agreeing to be bound strictly by the terms and conditions above named, and not to countermand this order."

The goods were shipped pursuant to said order to the defendants at San Jose, where they were conducting a music store, and they acknowledged receipt of the same. Monthly statements of the account were thereafter sent to them for a period of several months; and during that period of time they ordered and paid for other goods shipped to them under the terms of said contract.

About two months after the shipment of the goods in question said company wrote to defendants calling attention to the maturity of the "invoice dated April 20th, 1925, amount $1,452.50, covering sewing machines shipped" from San Francisco pursuant to their order, and, among other things, stated: "The terms on this sale provide for sixty days trade acceptance"; and an early remittance was requested. Under date of July 9, 1925, defendants replied, stating: "We are in receipt of your letter of June 30th, 1925, calling attention to the maturity of your invoice for sewing machines *recently purchased by us.* Because of the absence of the manager from San Francisco at this time, we are writing to you so *that our account will be taken care of directly";* and after referring to certain suggestions claimed to have

been made to them by the company's representative relating to the handling of installment contracts taken by defendants in the disposal of the goods by them, said: "Will it be satisfactory to make payment as follows: One third on or before the 25th day of July; one third in thirty days and one third in sixty days? Advise us at once if satisfactory."

In response the company telegraphed from its office in Cleveland, Ohio, to the effect that the terms of payment mentioned were not satisfactory, that the "terms of sale specified for payment sixty days following shipment" and that defendants "should comply strictly with those terms"; that the company would not settle on a basis of installment contracts. After some further correspondence, defendants, under date of August 11, 1925, wrote to said company terminating the contract. In this letter defendants stated: "After going over the situation carefully we have decided to discontinue handling sewing machines and wish to cancel at once the contract which we entered into as well as the verbal arrangements made at the same time," giving as the main reason for the cancellation the unsatisfactory development of the business, and the letter concluded: "Arrangements for closing up our account will be made when your representative calls." Replying, the company wrote: "Replying to yours of the 11th inst., in reference to the past due account with the Standard Sewing Machine Co., of Cleveland, Ohio, amounting to $1,452.50 which was due June 30th, would say that it is not necessary to wait until the arrival of our representative as mentioned in your letter to bring about a settlement of this account"; and after expressing regrets because of the discontinuance of the business stated that the "contract will be attended to by Mr. Knowlden" on his next visit to San Jose, but that "this arrangement has nothing whatever to do with the collection department, we are supposed and expected to collect all bills at maturity and all we know about the transaction is the order which you signed and is in our possession a copy of which I am herewith enclosing, we ship the goods to you in good faith and expect a prompt payment, but as there has been through Mr. Knowlden, talked extension of a portion of this bill." Concluding, the letter stated: "Now gentlemen, if you will remit by return mail $726.26

cash and endorse the enclosed trade acceptance for the same amount falling due in 30 days we will accept same as a matter of accommodating you, therefore, I hope you will immediately attend to this matter that I may square our records with the company.'' The foregoing proposition was apparently not acted upon, for on August 22, 1925, defendants again wrote said company as follows: ''Since the writer has returned from a short trip up to the northern part of the state no further delay will be necessary to advise you how we expect to close up your account. The arrangements which we had in mind several weeks ago for payment will have to be changed and we will expect to pay for the machines as contracts are cashed or sales made. This is in accordance with the arrangement originally made that it would not be necessary for this firm to advance any cash for the handling of the sewing machine business. . . . *We wish to be advised whether the machines we have on hand can be turned back in case we make arrangements for complete settlement.* Would you accept some of the contracts we have on hand as part settlement?'' (All italics ours.) The company replied as follows: '' . . . in reference to your indebtedness to The Standard Sewing Machine Co., of Cleveland, Ohio, would say, I am very much surprised at this late date and under all the circumstances surrounding this transaction that you would hold the idea expressed in your letter. Now gentlemen, we know of no such arrangement as expressed in your letter. The only arrangements that we have accepted are those embodied in the order endorsed by you, upon which we shipped you the goods and extended you the credit. . . . It would be impossible for us to repossess any portion of these sewing machines as a credit to your indebtedness. I am willing at all times to compromise and bring about a settlement but I cannot go beyond reason. Your account is now over sixty days past due and the Head Office has instructed me to proceed to collect this amount without further delay, at the same time, if you care to accept the proposition made you in my last letter it will hold good providing same is accepted and reported to this office at once. If you have made agreements aside from the ones mentioned on the order, it is between yourselves and the one you made the agreement with.''

The evidence further shows that some time during the following month Knowlden conferred with defendants in San Jose, at which time he suggested transferring the agency to other parties and turning back the unsold machines as used ones, at a discount. But nothing resulted from this conference, and defendants afterward notified said company that the machines they had not disposed of had been stored subject to the company's order; whereupon said company assigned its account to plaintiff and this action was commenced.

In discussing the same question as to the legal relationship created by the form of contract such as the parties here entered into, Professor Mechem says: "A qualified form of 'agency' which has grown up in modern times is that which exists when the owner or manufacturer of patented or other proprietary articles grants the privilege of sale or of exclusive territory to one who otherwise might not be at liberty to sell the goods in question. It is entirely consistent with this arrangement that the so-called agent is to buy, of the proprietor or manufacturer, the goods which he is thus authorized to sell, and when this is the fact there is little more of 'agency' in the case than the name itself. It is also entirely consistent with the arrangement that the 'agent' is to sell the goods at a price or upon terms or conditions fixed by the proprietor or manufacturer. A person so situated is often, in popular language, said to have obtained the 'agency' for the goods, when all that is meant is that he has obtained a more or less exclusive right to buy and resell them in a prescribed territory. The transaction is simple enough, but the reports show many cases in which the parties have, perhaps, deceived themselves and have certainly attempted to deceive others by calling that an 'agency' which had no resemblance to agency in fact, but was simply a sale of a proprietary article with a right of resale under terms and conditions fixed by the proprietor." (1 Mechem on Sales, pp. 41, 42.) And in announcing a test to be applied in differentiating between a sale and an agency to sell on consignment, the same author says: "Sale, further, is to be distinguished from the creation of an agency to sell. The essence of sale is, as has been seen, the transfer of the title to the goods for a price paid or to be paid. Such a trans-

fer puts the transferee, who has procured the goods to sell again, in the attitude of an owner selling his own goods, and makes him liable to the first seller as a debtor for the price, and not, as an agent, for the proceeds of the resale. The essence of the agency to sell is the delivery of the goods to a person who is to sell them, not as his own property but as the property of the principal, who remains the owner of the goods and who therefore has the right to control the sale, to recall the goods and to demand and receive their *proceeds* when sold, less the agent's commission, but who has no right to a *price* for them before sale or unless sold by the agent.'' (1 Mechem on Sales, pp. 40, 41.) In other words, the determinative rule is that if a person contracts to buy goods from another to sell on his own account, the transaction constitutes a sale and not an agency, even though it be so called by the parties (*Piper* v. *Oakland Motor Co.,* 94 Vt. 211 [109 Atl. 911], and cases therein cited).

We are of the opinion that the contract and the order in the present case, construed together as respondent contends they should be, clearly prove that, although an agency was created conferring upon defendants the exclusive privilege to resell the company's goods at a specific price within certain territory, it was contemplated thereby that the delivery of the goods by the company to defendants should constitute a sale thereof to the latter and not a consignment. This is made evident first by the language of the contract itself, from which it appears that the consideration for the creation of the exclusive agency to sell said goods was that defendants agreed ''to purchase'' from said company not less than twelve machines every month; and again by the order which shows that defendants agreed ''to pay'' said company for the goods ordered according to the schedule of prices therein specified upon the following terms: ''2% Discount 30 days or 60 days Net.''     Furthermore, it is a well-established rule of the law of sales that where there is nothing indicating a contrary intent, the delivery of the possession of goods operates to pass title; and that in the ordinary sale on credit title to the goods passes on delivery (*Phillips* v. *Stark,* 186 Cal. 369 [199 Pac. 509]). Neither of the documents under consideration here indicates that title to the goods should remain in the company after

delivery thereof to defendants, nor that defendants had the right after delivery to return the same or any part thereof to said company. For aught said documents show the goods ordered by defendants were to be paid for in sixty days, whether sold by defendants or not, clearly implying a sale and credit. Moreover, under the terms of the contract defendants were allowed to sell the goods when and on what terms they chose, provided they maintained the selling price specified in the contract. No accounts of sales were required to be rendered to the company, and, so far as the contract shows, there was to be no privity between the sewing-machine company and defendants' customers. If defendants accepted cash for the sale of said goods, they were not required to keep it separate, and if installment contracts or notes were taken from their customers, it was no concern of said company's; and the context of the contract and of the order evidence the fact that after delivery of said goods to defendants, absolute control and dominion over the same, except as to the resale price to the trade, was vested in them.

It is evident, we think, from the facts and circumstances above set forth that the contract and order in question implied a sale and not a mere agency to sell; that is, that defendants were to purchase the goods from said company to resell on their own account. All of the essential elements of sale are present, including the passing of title and assumption of risk and exclusive control by defendants following delivery. Furthermore, it would appear that defendants themselves regarded the transaction of delivery as a sale, because they proceeded to resell the goods on their own account and on terms of their own choosing; they also acknowledged the debt and offered to liquidate the same in various ways, first, by making three separate payments, secondly, by turning over the installment contracts which they had taken from their customers or the cash received therefrom as the contracts were paid, and finally, by returning to the company the unsold machines. For the foregoing reasons we are unable to sustain the trial court's finding that the shipment of said goods to defendants constituted a consignment and not a sale.

The situation is not altered by the fact that the contract employs the word "agency." As stated in the case

of *Commercial Credit Co.* v. *Girard Nat. Bank*, 246 Pa.
88 [92 Atl. 44]: "It is true that they are described in the
contracts as 'agents' and 'sales agents,' but as was said by
Lord Justice James in *Ex parte White, In re Nevill,* L. R.
6 Ch. App. (Eng.) 397, 399: 'There is no magic in the
word "agency." It is often used in commercial matters
where the real relationship is that of vendor and purchaser.'
In the same opinion Lord Justice Mellish said (page 403):
'Persons may suppose that their relationship is that of
principal and agent, when in point of law it is not.' In
*Ex parte Flannagans* (U. S. D. Ct. E. D. Va.) 2 Hughes,
264, 268 Fed. Cas. No. 4855, the court quoted with approval
the above language, and added: 'If the contract in its terms
really constituted them purchasers, the use of the words
implying that they were agents does not change the fact.' "
Nor can defendants' status be brought within the classi-
fication of a factor, as they claim, for the reason that under
such relationship title to the goods does not pass with
delivery, but remains in the consignor (*Cass* v. *Rochester,*
174 Cal. 358 [163 Pac. 212]; 12 Cal. Jur. 411). Here,
as pointed out, title passed upon delivery.

■ Defendants also urge in support of the judgment
that whether the contract be deemed to be one of agency
or of sale plaintiff may not recover because defendants
terminated the contract in the manner therein provided.
We find no merit in the point. It is evident that the thirty
days' notice of termination given by defendants, dated
August 11, 1925, operated to release the defendants from
further obligation to purchase goods after the notice be-
came effective; but obviously said notice could not serve
to extinguish the indebtedness which defendants had in-
curred under the contract prior to giving the notice.

■ Further contention is made by defendants that
as a result of the conference with Knowlden in September,
1925, following the termination of the agency, the written
contract in question was superseded by an oral one made
by Knowlden whereby he agreed to accept a return of the
machines, and that he actually did take one of them with
him. Knowlden's testimony was somewhat at variance
with the foregoing claim. However, novation of contract
was not pleaded as a defense, nor was any finding made on
such an issue; there was no evidence offered to prove that

Knowlden was authorized to make any substituted or new agreement on behalf of said company; and moreover, both the contract and the order contained express stipulations that no other contract, promise or agreement was binding upon said company. On the other hand, definite rejection of all offers of settlement of the debt on the basis of repossessing the goods was declared in the company's letters, it having expressly stated in one of them that Knowlden's contemplated visit to San Jose would have nothing whatever to do with the collection of the account. We therefore find no merit in this final contention.

The evidence, in our opinion, being legally insufficient to support the finding that there was no sale of the goods, the judgment is reversed.

Tyler, P. J., and Cashin, J., concurred.