STATE OF MISSOURI at the Relation of CITIES SERVICE GAS COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION and MILTON R. STAHL, ALMON ING, J. H. PORTER, J. FRED HULL and GEO. H. ENGLISH, as Members of the Public Service Commission.—85 S. W. (2d) 890.

Court en Banc, September 4, 1935.

812

*James W. Finley, R. E. Cullison* and *Charles H. Mayer* for appellant; *Mayer, Conkling & Sprague* of counsel.

*D. D. McDonald* and *Sam Hargus,* General Counsel, and *James P. Boyd,* Assistant Counsel, for Public Service Commission.

*Jones, Hocker, Sullivan, Gladney & Reeder,* amicus curiae.

TIPTON, J.—This is an appeal by the Cities Service Gas Company, from a judgment of the Circuit Court of Cole County, where that court affirmed, on a writ of review, an order of the Missouri Public Service Commission. The relator, the Cities Service Gas Company, will be hereafter referred to as the Pipe Line and the Public Service Commission as the Commission.

This cause was instituted by the Commission on its own motion against the Pipe Line; Kansas City Gas Company; Carthage Gas Company; Jackson County Light, Heat & Power Company; Joplin Gas Company; St. Joseph Gas Company; City Light & Traction Company; Webb City & Carterville Gas Company; Ozark Distributing Company; Springfield Gas & Electric Company; and Carl Junction Gas Company, to determine if the Pipe Line was a public utility engaged in the sale and distribution of industrial gas in Missouri, and as such required to file schedules of rates. The investigation did not involve the rates charged or the valuation of property. The Commission dismissed as to Carl Junction Gas Company.

The Commission found that the Pipe Line was selling and distributing industrial gas to consumers located in the cities in this State through the Kansas City Gas Company; St. Joseph Gas Company; Joplin Gas Company; Carthage Gas Company; and Webb City & Carterville Gas Company, and that it was directly selling and distributing industrial gas from its pipe line in Missouri to consumers in this State outside the cities. The Commission further found that in so distributing industrial gas the Pipe Line was engaged in intrastate business as a public utility, and that it should file with the Commission its schedules of rates and its rules as to terms and conditions for the sale and distribution of industrial gas and thereby submit to the provisions of the Public Service Commission Act of Missouri. The Commission made an order in conformity with the above findings. The order did not include the Jackson County Light, Heat & Power Company, Springfield Gas & Electric Company, Ozark Distributing Company and City Light & Traction Company.

The Pipe Line Company contends (1) that the distributing companies are not its agent in the sale and distribution of industrial gas to consumers in cities of Missouri; (2) that it is not engaged in intrastate business by directly selling and distributing industrial gas to consumers in this State outside of these cities, and that the order of the Commission in so holding imposes a direct burden upon

interstate commerce within the meaning of the Commerce Clause of the Federal Constitution.

In its brief the Commission concedes that there is no dispute as to what the Pipe Line is actually doing in Missouri; that "the controversy is over the legal conclusions to be drawn from its action."

The facts upon which the Commission found that the Pipe Line was distributing gas to industries in cities by the distributing companies as its agents are as follows:

The Pipe Line is a Delaware corporation engaged in producing, gathering and selling natural gas, produced and gathered in Texas, Oklahoma and Kansas, and transported by it through its pipe lines into Missouri. The common stock of the Pipe Line except qualifying shares held by the directors, is owned by the Empire Gas & Fuel Company, the common stock of which is owned by the Cities Service Company. The other companies mentioned in the report are distributors of gas in Missouri.

The Gas Service Company owns the common stock of the Kansas City Gas Company, Carthage Gas Company, Jackson County Light, Heat & Power Company, Joplin Gas Company, St. Joseph Gas Company, Ozark Distributing Company, and Webb City & Carterville Gas Company. The entire capital stock of the Gas Service Company is owned by the Cities Service Company. The common stock of the City Light & Traction Company is owned by the Cities Service Company. The common stock of the Springfield Gas & Electric Company is owned by the Federal Light & Traction Company, which company is controlled by Cities Service Company. In other words, the Cities Service Company owns and controls all these companies, including the Pipe Line.

There is an interlocking of the boards of directors of the Gas Service Company, Pipe Line and the distributing companies, and these companies have numerous common officers. In some instances local citizens and active officers have been made directors.

The Pipe Line furnishes all the gas required by the distributing companies, except the Jackson County Light, Heat & Power Company, which was under contract with the Missouri-Kansas Pipe Lines Company (now Panhandle Eastern Pipe Line Company), for gas before the Cities Service Company acquired control of it.

The Pipe Line operates three sixteen-inch lines to the Missouri-Kansas State Line and delivers at the city gate to the Kansas City Gas Company of Missouri all the gas required by said company except small quantities delivered to it by the American Pipe Line Company and Wyandotte County Gas Company, which companies are owned by Cities Service subsidiary companies. It also operates a twelve inch line from Ottawa, Kansas, to Sedalia, Missouri, serving that city, and with lateral lines serving other cities in Missouri. It also operates a ten inch line to Springfield, Missouri, serving that

city and with lateral lines serving other cities in southwest Missouri. It also serves other sections of the State and serves consumers along its lines in this State outside said cities.

It furnishes natural gas for domestic purposes to the distributing companies at the city gate at forty cents per one thousand cubic feet, except at Carthage, Webb City and Carterville, where the gas is furnished under a different plan. It also furnishes industrial gas to these companies in these cities and directly furnishes industrial gas from its lines in Missouri to customers in this State outside of these cities. It maintains sufficient pipe line capacity to furnish gas for domestic purposes in cities during the winter· season. However, the amount of gas furnished to the distributing companies for these purposes during the spring, summer and fall seasons of the year is greatly reduced.

It had no written contract with most of the distributing companies, and there was no correspondence indicating the terms or conditions of a contract. It had written contracts with the Springfield Gas & Electric Company and Ozark Distributing Company executed prior to the control of these companies by the Pipe Line.

There is on file with the Commission the schedules of rates of the distributing companies for both domestic and industrial gas. The rate to the public for domestic gas is in excess of forty cents per one thousand cubic feet, the purchase price. The rates for industrial gas are as low as fifteen cents per one thousand cubic feet.

On the question of agency the Kansas City Gas Company is typical of the distributing companies. It receives all its gas requirements from the Cities Service Gas Company, except a small amount furnished by the American Pipe Line Company and Wyandotte County Gas Company. It has on file with the Commission two schedules of rates for the sale of gas at less than forty cents per thousand cubic feet.

First, the rate to industrial consumers who use over 200,000 cubic feet per month begins with a charge of $2 for the first one thousand cubic feet of gas and slides down to fifteen cents per thousand cubic feet for all gas used over 50,000 cubic feet per month.

Second, the rate to customers using gas under boilers with a monthly consumption exceeding 150,000 cubic feet per month, begins with a charge for the gas used to operate the customers' equipment for one hundred hours at maximum of twenty-five cents per thousand cubic feet and slides down to a rate of twenty cents per thousand cubic feet for all gas used in excess of the hundred hour use and 3,000,000 cubic feet per month.

In 1930 it furnished 8,237,268,000 cubic feet of industrial gas at an average rate of 14.2 cents to fifty industrial customers and sixty-four boiler customers in Kansas City, receiving therefor $1,170,875.31. However, industrial customers paid from fifty cents to $2 per thou-

sand cubic feet for gas purchased on the first three steps. It also furnished 7,396,165,000 cubic feet of gas to domestic customers, for which it paid a flat rate of forty cent per thousand cubic feet.

It also paid forty cents per thousand cubic feet for 191,555,000 cubic feet of industrial gas furnished to customers, and paid for all gas above 5,000,000 cubic feet the various rates charged each industrial customer, less three and one-half cents per thousand cubic feet. It received said three and one-half cents regardless of the amount paid for gas by the different industrial customers, and absorbed the expense of service, leakage and bad debts. The total amount of the readings on the industrial and boiler customers' meters was deducted from the city gate meters to determine the amount of domestic gas.

The fuel business of industries in Kansas City is solicited by the Kansas City Gas Company. In doing so it competes with coal and oil. If the negotiations are successful the contract is reduced to writing and signed by the Kansas City Gas Company and the industry. It contains a shut-off clause in favor of domestic customers and states the price, gas requirements, peak load, duration of service and possibly other terms. It must be submitted to the Pipe Line for its approval. If the price, terms and the industry itself are satisfactory to the Pipe Line it approves the contract. The gas is measured by the meter of the industry, which meter must be approved by the Pipe Line. The amount received by that company from industrial gas is determined by the consumption of each industrial consumer and can be determined only by calculations based upon each consumer's bill. The bill of each consumer must be analyzed because they buy on different steps, depending on consumption, and in each case on sales at less than forty cents per thousand cubic feet, the Pipe Line receives the selling price to each industrial consumer on the various steps, less three and one-half cents per thousand cubic feet.

It should be stated that only eight million cubic feet of gas for domestic purposes is distributed in Kansas City during the summer season, whereas, during the winter season there is distributed in that city seventy-five million cubic feet of gas for said purposes. Therefore, if the Pipe Line sells no industrial gas during the summer season, sixty-seven seventy-fifths of its pipe line capacity and gas reserves are idle.

The amount of gas delivered by the Pipe Line to the Kansas City Gas Company, for domestic purposes is determined by deducting the total amount of gas distributed to the industries from the amount of gas delivered at the city gate.

The question whether the relation between Pipe Line and the Kansas City Gas Company is that of vendor and vendee, or principal and agent must be determined by their acts and conduct.

"If relations exist which will constitute an agency, it will be an agency, whether the parties understand it to be or not. Their private intention will not affect it. It is not essential that any actual contract should subsist between the parties or that compensation should be expected by the agent; and while the relation, in its full sense, invariably arises out of a contract between the parties, yet the contract may be either express or implied." [21 R. C. L. 819.] "Whether an agency exists, under an ascertained state of facts, is a question of law to be determined by the court." [Seehorn v. Hall, 130 Mo. 257, l. c. 262, 32 S. W. 643.] "The person alleging the existence of an agency must bear the burden of establishing the fact." [21 R. C. L. 820.]

1 Mechem on Agency (2 Ed.), page 30, section 48, the author says:

"These doubtful cases are to be determined, not by the name which the parties have seen fit to apply to their contract but by its true nature and effect. The essence of sale is the transfer of the title to the goods for a price paid or to be paid. Such a transfer puts the transferee, who has obtained the goods to sell again, in the attitude of one who is selling his own goods, and makes him liable to the person from whom he received them as a debtor for the *price* to be paid and not liable as an agent for the *proceeds* of the resale. The essence of agency to sell is the delivery of the goods to a person who is to sell them, not as his own property but as the property of the principal, who remains the owner of the goods and who, therefore, has the right to control the sale, to fix the price and terms, to recall the goods, and to demand and receive their *proceeds* when sold, less the agent's commission, but who has no right to a *price* for them before sale or unless sold by the agent."

"Agency may also be defined as the relation created by express or implied contract or by law, whereby one party delegates the transaction of some lawful business with more or less discretionary power of another, who undertakes to manage the affair and render to him an account thereof." [Burkhalter v. Ford Motor Co. (Ga.), 116 S. E. 333.]

We do not agree with the Commission that the evidence justifies the conclusion that the Pipe Line is selling industrial gas to industries located in Kansas City and that the Kansas City Gas Company is the agent of the Pipe Line in these transactions.

The Commission does not contend that the corporate entity of these companies should be disregarded. But it does contend that the "unity of control" and the "community of interest" should be considered with other evidence in determining whether or not the Pipe Line is engaged in intrastate commerce. It cites in support of this proposition the case of Western Distributing Co. v. Public Service Commission of Kansas, 285 U. S. 119, and the case of Smith

v. Illinois Bell Telephone Co., 282 U. S. 133. These cases hold that where a utility makes a contract with an affiliated company; that in a rate case where such contract affects the operating expenses of the utility so as to affect the rates, that the burden is on the utility to establish the fairness and reasonableness of such contract. These cases do not discuss the question of agency, but simply hold that where one corporation controls another corporation through stock ownership, then the two companies are not dealing at arms length with each other, and in making contracts that might affect the rates the public must pay to the utility, it has the burden to show that such contracts are reasonable. In the recent case of Dayton Power & Light Co. v. Public Utility Commission of Ohio, 78 L. Ed. 1267, the Supreme Court of the United States reaffirmed that doctrine. That court in citing the Western Distributing Co. v. Kansas Public Service Commission Case, supra, said:

"Even so, the burden of proof was on the buyer of the gas to show that in these transactions with the affiliated seller the price was no higher than would fairly be payable in a regulated business by a buyer unrelated to the seller and dealing at arm's length. [Western Distributing Co. v. Kansas Public Service Commission, 285 U. S. 119, 124, 76 L. Ed. 655, 658, 52 Sup. Ct. 283.]"

The investigation under review did not involve the question of rates, and therefore, it is not important that Pipe Line and the distributing companies were affiliated companies.

In the case of Houston v. Southwestern Bell Telephone Co., 66 L. Ed. 961, l. c. 964, the Supreme Court of the United States said:

"Under the circumstances disclosed in the evidence, the fact that the American Telegraph & Telephone Company controlled the company (Southwestern Bell Telephone Company) and the Western Electric Company by stock ownership *is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the company.*" (Italics ours.)

The fact that the Pipe Line fixes the price at which industrial gas is sold by the Kansas City Gas Company does not of itself create the relation of agency. It has many times been held that the vendor has a right to fix the price at which the vendee may sell the merchandise. [Banker Bros. Co. v. Commonwealth of Pennsylvania, 56 L. Ed. 168; Standard Fashion Co. v. Magrane-Houston Co., 66 L. Ed. 653; Watkins Medical Co. v. Holloway, 182 Mo. App. 140, 168 S. W. 290; Burkhalter v. Ford Motor Co., supra; Reiter v. Anderson (Cal.), 262 Pac. 415; Rawleigh Co. v. Trerice (Mich.), 195 N. W. 79; Chapman v. Dowling Hardware Co. (Ala.), 88 So. 748.]

The evidence shows that the Pipe Line and the Kansas City Gas Company made an arrangement by which the latter company would solicit contracts with industries and to submit each contract to the Pipe Line, each contract was required to contain a shut-off clause.

The contracts were in writing and signed by the industry and the Kansas City Gas Company. The Pipe Line was not a party to the contract. If the contract was approved by the Pipe Line, it furnished to the distributing company the quantity of gas required under the contract, at a price to the distributing company of three and one-half cents per thousand cubic feet less than the price stipulated in the written contract with the industry. The Pipe Line delivered the gas at the city gate to the distributing company the same as it delivered domestic gas. The evidence shows that the distributing company was responsible to the industry for the service, that the Pipe Line was paid for the gas, regardless of the fact that the industry may not have paid for the gas, and that the Pipe Line was paid for all gas that came through the meter at the city gate, which included gas that leaked out of the mains of the distributing company. The Kansas City Gas Company may defer the collection of bills so far as the Pipe Line is concerned, or it may rebate or compromise any bill. "It is a well-established rule of sales that, where there is nothing indicating a contrary intent, the delivery of possession of goods operates a passing of title; and in the ordinary sale on credit title to goods passes on delivery." [Reiter v. Anderson, supra.] We find nothing in the evidence to show an intent on part of the Pipe Line to retain title after the gas was delivered to the distributing company at the city gate.

The Commission does not contend that the transaction is one of agency because the amount received by the Pipe Line for industrial gas can be determined only by calculations based upon each consumer's bill. But it does contend that the above-stated method of determining the amount received by the Pipe Line for industrial gas should be considered with other facts in determining the question of sale or agency. We cannot see where this fact would have much bearing on the question one way or the other. It is a well-settled rule of law that where it appears that there has been a delivery of property, in accordance with the terms of a contract of sale, the title to property passed although the property must be later measured, weighed or counted so as to ascertain the total amount due the vendor. [Odell v. Railroad, 109 Mass. 50; Burrows v. Whitaker, 71 N. Y. 291; McMillan v. Schweitzer, 87 Mo. 402.]

While not controlling, we think it significant that the Pipe Line did not have a franchise with the cities to deliver gas to industries.

We would have to assume that the Pipe Line was violating Section 5195, Revised Statutes 1929, without evidence proving that fact. That section provides, among other things, a franchise cannot be transferred in whole or part without permission from the Commission. The Pipe Line lacks authority to engage, by agent or otherwise, to transport gas through the mains located in the streets of Kansas City.

We think the facts in this case show that the distributing companies are liable for the price to be paid for the gas delivered to them by the Pipe Line and not the proceeds of the resale of the gas. There is no substantial evidence to sustain the finding of the Commission that the Pipe Line was selling gas to industries through the distributing companies as its agents.

■ The Pipe Line next contends that it is engaged in interstate business by directly selling and distributing industrial gas to consumers in this State, outside of the cities.

It has fifteen written contracts with industries in Missouri, outside of the cities, to sell them industrial gas. However, it is only furnishing gas to twelve industries. The gas is sold at rates varying from fifteen cents to seventy cents per thousand cubic feet, depending upon the size of the plant and the number of cubic feet the industry consumes. Each contract contains a shut-off clause. One customer pays a flat rate of eighteen cents per thousand cubic feet, whereas another -customer pays seventy cents per thousand cubic feet for the first 150,000 cubic feet per month, and thirty-five cents per thousand cubic feet for the balance of the gas consumed. The other rates vary but are similar. The contracts are signed by the industry in Missouri and signed by the Pipe Line at Bartlesville, Oklahoma. The individual companies pay for the gas at the office of the Pipe Line in that city.

Q. R. Dungan testified that he was office manager of the Pipe Line and lived in Bartlesville, Oklahoma. In his testimony he referred to selling gas to these twelve industries at "wholesale," evidently he meant in large quantities, as the gas was not resold, but used by the industries. He also testified that the Pipe Line would serve all customers with industrial gas along its main lines in this State on terms satisfactory to it. His testimony on this point is as follows:

"Q. What would be the minimum amount of gas sales for which you would tap one of your pipe lines to furnish? A. Well, there is a fixed minimum. It depends again upon the condition of the sale. An industry that would use a million feet a month would be entirely different from one that would use a million feet a year, and another thing that would be considered is whether the peak load came in the summer or the winter time, and other conditions under which the gas would be sold.

"Q. What are the factors you would take into consideration in determining whether or not you would tap the line in order to put on the industry? A. The first would be the class of sale, and that would determine the time of the peak demand; also the character of the sale, whether it is 24 hours a day or less, or whether it is 7 days a week or less, whether the peak is in the summer or in the winter, whether the industry will take a contract which has what we call a shut-off clause where we discontinue that service in case of increased demands for domestic gas."

Cross-examination by Judge MAYER:

"Q. Mr. Dungan, you were talking about if an industry along your line or off of your line wanted to take gas from the pipe line company, outside of the city limits, I mean: you would serve it to them? A. Yes.

"Q. You mean, after bargaining with them, if you could fix a price to suit the pipe line company, you would do it? A. Yes, sir.

"Q. And if you couldn't, you would refuse to do it? A. Yes, sir.

"Q. If you can make a bargain that is satisfactory you would sell, but if not, you would refuse it? A. Yes, sir.

"Q. And if you do sell, it is based on a contract between that particular industry and the pipe line company? A. Yes, sir."

It is admitted that the gas came into this State from either Kansas, Oklahoma, or Texas. It is, therefore, interstate commerce when it comes into this State. If the Commission is correct in its order, it must cease to be interstate commerce at some point before it is delivered to the industry. "That the transportation of gas through pipe lines from one state to another is interstate commerce may not be doubted. Also, it is clear that as a part of such commerce *the receivers might sell and deliver gas so transported to local* distributing companies free from reasonable interference by the State." (Italics ours.) [Public Utilities Commission v. Landon, 249 U. S. 236, 1. c. 244.]

In the recent case of East Ohio Gas Co. v. Tax Commission, 75 L. Ed. 1171, 1. c. 1174, the Supreme Court of the United States stated the rule in respect to when gas was delivered from one state to another was interstate commerce, and when such gas became intrastate commerce in the following language:

"The transportation of gas from wells outside Ohio by the lines of the producing companies to the state line and thence by means of appellant's high pressure transmission lines to their connection with its local systems is essentially national—not local—in character and is interstate commerce within as well as without that state. The mere fact that the title or the custody of the gas passes while it is enroute from state to state is not determinative of the question where interstate commerce ends. [Public Utilities Commission v. Landon, 249 U. S. 239, 245, 63 L. Ed. 577, 586, P. U. R. 1919C, 834, 39 Sup. Ct. 268; Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U. S. 298, 307-309, 68 L. Ed. 1027, 1029, 1030, 44 Sup. Ct. 544; Peoples Natural Gas Co. v. Public Serv. Commission, 270 U. S. 550, 554, 70 L. Ed. 726, 729, 46 Sup. Ct. 371; Public Utilities Commission v. Attleboro Steam & Electric Co., 273 U. S. 83, 89, 71 L. Ed. 549, 553, 47 Sup. Ct. 294.] But when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the produc-

ing companies, its volume thereby is expanded to many times what it was while in the high pressure interstate transmission lines, and it is divided into the many thousand relatively tiny streams that enter the small service lines connecting such mains with the pipes on the consumers' premises. So segregated the gas in such service lines and pipes remains in readiness or moves forward to serve as needed. The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale and sold at retail. [State ex rel. Caster v. Flannelly, 96 Kan. 372, 383, 384, P. U. R. 1916C, 810, 152 Pac. 22; West Virginia & M. Gas Co. v. Towers, 134 Md. 137, 143, 145, P. U. R. 1919D, 332, 106 Atl. 265; Cf. Atlantic Coast Line Railroad Co. v. Standard Oil Co., 275 U. S. 257, 269, 72 L. Ed. 270, 275, 48 Sup. Ct. 107; Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Leisy v. Hardin, 135 U. S. 100, 34 L. Ed. 128, 3 Inters. Com. Rep. 36, 10 Sup. Ct. 681.] It follows that the furnishing of gas to consumers in Ohio municipalities by means of distribution plants to supply the gas suitably for the service for which it is intended is not interstate commerce but a business of purely local concern exclusively within the jurisdiction of the state.''

Also in the case of Missouri ex rel. Barrett v. Kansas Natural Gas Co., 68 L. Ed. 1027, 1. c. 1030, the Supreme Court of the United States said:

''The business of supplying, on demand, local consumers is a local business, even though the gas be brought from another state and drawn for distribution directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance. But here the sale of gas is in wholesale quantities, not to consumers, but to distributing companies for resale to consumers in numerous cities and communities in different states. The transportation, sale, and delivery constitute an unbroken chain, fundamentally interstate from beginning to end, and of such continuity as to amount to an established course of business. The paramount interest is not local but national, admitting of and requiring uniformity of regulation. Such uniformity, even though it be the uniformity of governmental non-action, may be highly necessary to preserve equality of opportunity and treatment among the various communities and states concerned.''

One of the main pipe lines of the company runs from the State of Kansas to the city of Sedalia in this State. From this main pipe line a lateral pipe line runs north to the city of Lexington, where the gas is delivered to the distributing company for resale to domestic consumers of that city. In oral argument of this case in this court the

Commission admitted the delivery of gas to the distributing company in Lexington was interstate commerce, and the gas in that instance did not become intrastate commerce until it reached the distributing pipe lines of that company for resale to the domestic trade. But in arguing this case, the Commission contended that if an industry was served in the vicinity of Warrensburg, the interstate movement ceased at the point that the gas left the main pipe line and entered the lateral pipe line that served the industry. In both instances there was a previous contract with the Pipe Line for the sale of the gas before it left the foreign state and it was delivered direct to the purchaser in this State without any storing or holding to be served on demand. We can see no distinction in these two instances mentioned. Both are interstate commerce.

In the case at bar, the only reasonable inference to be drawn from the evidence, is that the gas is delivered from the foreign state directly to the industrial consumer in this State in compliance with a contract that was in existence between such consumer and the Pipe Line. We think it is immaterial whether the Pipe Line owns all or part of the lateral pipe line that the gas passes through from the main pipe line to the industry as it was a continuous movement. It, therefore, follows that under rules announced in the East Ohio Case, supra, and Barrett v. Kansas Natural Gas Co., supra, that the Pipe Line was engaged in interstate commerce when it was delivering gas to the twelve industries and that the Commission does not have jurisdiction of the Pipe Line on account of these sales, unless it is given jurisdiction on account of other questions hereinafter discussed.

The Commission also contends that the Pipe Line owns all the gas that it transports and is therefore not a common carrier and because it availed itself of the power of eminent domain under Section 20, Article II, of the Constitution of Missouri it is a public utility and should not be heard to say that it is not engaged in intrastate business. In availing itself of this power it filed suits in this State to acquire by condemnation an easement in certain lands herein to be used as a right of way for its pipe lines. In the petition in these suits it alleged: "That it is a corporation organized for the purpose among other things, of transporting and carrying gas by means of pipes and pipe lines laid underneath the surface of the ground through the States, among others, of Oklahoma, Kansas and Missouri, for the distribution and sale of gas as a public commodity, and for the public use and convenience; . . . that to carry out such purpose in the State of Missouri plaintiff has the permission and authority of the Public Service Commission of the State of Missouri to lay said pipe line underneath the surface of the ground through Missouri . . . and through the tracts and parcels of land which plaintiff asks herein to appropriate for said public use."

The Commission relies upon the case of Producers' Transportation Co. v. Railroad Commission, 176 Cal. 499, affirmed 251 U. S. 228. In that case the court held that inasmuch as the plaintiff had alleged in its petition in its condemnation cases that it was a common carrier, that it would be estopped from later denying that fact. The Pipe Line in that case was wholly within that State, and no question of interstate commerce was involved. That case is not in point. We think the test is not what powers the Pipe Line alleged, in its condemnation petition that it had under its charter but what it was actually doing. On principle, our case of Sate ex rel. Danciger & Co. v. Public Service Co., 275 Mo. 483, l. c. 493, 205 S. W. 36, is in point. The question in that case was whether the relator was a public utility. In that case we said:

". . . It is enough to say that in determining whether a corporation is or is not a public utility, the important thing is, not what its charter says it may do, but what it actually does. [Terminal Taxi Cab Co. v. Kutz, 241 U. S. 252.]"

The Pipe Line is a foreign corporation licensed to do business in this State and secured a permit from the Commission to lay pipe lines in this State. It had the same powers as a domestic corporation. Section 4596, Revised Statutes 1929; Southern Illinois Bridge Co. v. Stone, 174 Mo. 1, 73 S. W. 453; and under Section 1340, Revised Statutes 1929, it had the power to condemn land to lay pipe lines if for public use.

In the case of Ozark Pipe Line Co. v. Monier, 69 L. Ed. 439, the Supreme Court of the United States said:

"Nor is it material that appellant applied for and received a Missouri license or that it had the power thereunder to exercise the right of eminent domain. These facts could not have the effect of conferring upon the state an authority, denied by the Federal Constitution, to regulate interstate commerce. The state has no such power even in the case of domestic corporations."

We think that because the Pipe Line condemned land and applied to the Commission for a certificate to lay the pipe lines did not estop it from denying that it was engaged in intrastate commerce.

The Pipe Line admits it is a public utility, but contends that if it is engaged solely in interstate commerce, then the Commission does not have jurisdiction of it. On the authority of Public Utilities of Rhode Island v. Attleboro Steam & Electric Company, 71 L. Ed. 549, we think the Pipe Line is correct in its contention. In that case the court said:

"The test of the validity of a state regulation is not the character of the general business of the company, but whether the particular business which is regulated is essentially local or national in character; and if the regulation places a direct burden upon its interstate business it is none the less beyond the power of the state because

this may be the smaller part of its general business. . . . Plainly, however, the paramount interest in the interstate business carried on between the two companies is not local to either state, but essentially national in character."

We think that the Pipe Line was engaged in interstate commerce and that it was not subject to the jurisdiction of the Commission. From what we have said it follows that the judgment of the circuit court should be reversed. It is so ordered. *Ellison, Hays* and *Leedy, JJ.*, concur; *Collet, J.*, not sitting because of his connection with Public Service Commission; *Gantt, J.*, dissents in separate opinion in which *Frank, C. J.*, concurs.

GANTT, J. (dissenting).—The Commission ruled that the Pipe Line was engaged in intrastate business by selling and distributing industrial gas to consumers both inside and outside the cities of this State. ENGLISH, C., in concurring, was of the opinion that the facts warranted the ruling on the further ground that the Pipe Line had destroyed the corporate entity of the distributing companies.

The majority opinion reverses the judgment of the circuit court affirming the ruling of the Commission. It states that the Pipe Line admitted that it was a public utility. If so, and it is distributing gas in this State, that would be the end of this case, and the judgment of the circuit court should be affirmed. On the oral argument it was stated that the Pipe Line was a public utility. Thereafter, and in the course of the argument, it was stated that it was a "national utility." There are no "national utilities" as those words were used on the argument. We have interstate common carriers, but said company contends that it is not a common carrier. We also have utilities serving local communities and the people of the State. Furthermore, no legislation regulating commerce in gas has been enacted by Congress. The statement that the Pipe Line was a public utility was made *arguendo*.

The majority opinion proceeds upon the theory that the record presents the question of whether or not the distributing companies were agents of the Pipe Line to sell gas to industries. It quotes from Mechem the rule governing such an agency.

The record presents no question of agency to sell. It presents the question of whether or not the distributing companies are agents of the Pipe Line to transport and deliver gas sold by the Pipe Line to industries. There is absolutely no evidence tending to show a resale of the gas to the industries. The case is not in point. However, it should be noted that said opinion neither sets forth the last paragraph of the quoted section nor the preceding section.

The opinion also states that the Pipe Line sold the gas "at a price to the distributing company of 3½ cents per thousand cubic feet less than the price stipulated in the written contract with the industry."

The quoted conclusion of the majority opinion is taken from the brief of the Pipe Line. This amusing and "back-handed" method of statement is an effort on the part of the Pipe Line to appear as vendor of the gas to the Kansas City Gas Company rather than as vendor to the industry. The statement should be taken as an admission that the situation is "ticklish."

The majority opinion thinks that the Pipe Line should be presumed innocent of a violation of Section 5195, Revised Statutes 1929. Of course, there is a presumption that all persons, including corporations, act lawfully, however, such presumption disappears on the appearance of evidence. If, as stated in said opinion, there is no substantial evidence tending to show an agency, why is said presumption invoked. Furthermore, for ought that appears, the Commission may have approved the transportation of gas by the distributing companies. It is admitted that the Kansas City Gas Company receives three and one-half cents per thousand cubic feet for transporting the gas to the Independence distributing company. It is not suggested that the transportation of said gas is a violation of said section.

The majority opinion quotes from Seehorn v. Hall, 130 Mo. 257, l. c. 262, 32 S. W. 643, as follows: "Whether an agency exists, under an ascertained state of facts, is a question of law to be determined by the court." In that case the question of agency was submitted to the jury. I assume that this statement of a familiar rule was made on the theory that the facts are admitted in the instant case. "In some quarters" it is contended that absent conflict in the evidence, the facts are admitted. On the contrary if different reasonable inferences may be drawn from the evidence, the facts are not admitted. For instance, if a case is submitted on an agreed statement, it does not follow that the facts are admitted. Different reasonable inferences may be drawn from said statement.

It also quotes from Reiter v. Anderson (Cal.), 262 Pac. 415, l. c. 418, as follows: "It is a well-established rule of the law of sales that, where there is nothing indicating a contrary intent, the delivery of possession of goods operates to pass titles; and that in the ordinary sale on credit, title to the goods passes on delivery." This is elementary. But in the instant case there is evidence "indicating a contrary intent."

It also quotes from 21 Ruling Case Law, 819. as follows: "If relations exist which will constitute an agency, it will be an agency whether the parties understand it to be or not. Their private intentions will not affect it." After thus stating the rule the opinion states: "We find nothing in the evidence to show an intent on part of the Pipe Line to retain title after the gas was delivered to the distributing company at the city gate." In view of the quoted rule from Ruling Case Law, of what consequence is the intent of the Pipe Line.

■ I. I do not agree with the reasoning or the ruling of said opinion on the question of agency. It draws unreasonable inferences, ignores material facts and circumstances in evidence and reviews the case as an action at law. The frequent statements in said opinion that the Commission or its attorney made certain statements and admissions, and the citation of certain authorities therein, show conclusively that the record was so reviewed.

This method of reviewing an order of the Commission is contrary to the rulings of this court. The case is here for determination on the evidence and as a proceeding in equity. The evidence must be considered *de novo*. [State ex rel. v. Public Service Comm., 271 Mo. 155, 196 S. W. 369; Railroad v. Public Service Comm., 266 Mo. 333, l. c. 346, 181 S. W. 61.]

The Pipe Line had no written contracts with the distributing companies and there was no correspondence indicating the terms or conditions of a contract. In this situation the question of sale or agency must be determined from a consideration of all the facts and circumstances in evidence, the nature of the transaction, the conduct of the parties with reference thereto, and the relationships existing between the Pipe Line and the distributing companies.

The Kansas City Gas Company is typical of the distributing companies. Therefore, only the evidence relating to the industries in Kansas City will be considered. There is no conflict in the evidence.

The majority opinion adopted the argumentative conclusions of the Pipe Line in its brief as the "ascertained facts" of the case. It will not be contended that the evidence does not show the following:

The Pipe Line and Kansas City Gas Company had an "arrangement" by which the latter company solicited contracts with industries in the city. If the efforts of the Kansas City Gas Company were successful, said company had the industry sign a contract, which fixed the price of the gas, set forth the gas requirements and peak load of the industry, the duration of service and contained a clause authorizing a discontinuance of the service without notice to the industry. The Kansas City Gas Company then submitted the contract to the Pipe Line for approval. If the price, terms and the industry itself were satisfactory to the Pipe Line, it approved the contract. If it approved the contract, the Kansas City Gas Company signed the contract. The Pipe Line did not sign the contract. The gas was measured by the meter of the industry, which meter must be approved by the Pipe Line. The Kansas City Gas Company received three and one-half cents per thousand cubic feet for the gas delivered to the industry. It received said sum regardless of the price paid by the industry for the gas. Under said "arrangement" the Kansas City Gas Company absorbed all losses from bad debts and leakage and was responsible to the industries for service.

On the question T. J. Strickler, vice-president and general manager of the Kansas City Gas Company testified as follows:

"Q. The industrial gas is paid for on a basis to be determined? A. The basis that is determined—as a preliminary before a contract is entered into between the individual industry or between the industries as a class and the Kansas City Gas Company—in other words, the Kansas City Gas Company felt that there was a certain industrial market here; it surveyed that market; it arrived at a price at which it felt gas could be disposed of in that industrial market. It then said to the pipe line company: Knowing that there is a certain industrial market for gas and feeling that we know what price that can be disposed of, we can afford to pay the pipe line company such a price, according to the volume of the gas. The pipe line company, having in general agreed to that, that schedule for the price to the industrial consumer was filed with the Missouri Commission.

"Q. The pipe line company did not participate in determining what the price was to the industrial consumer? A. No, sir. The Kansas City Gas Company, being responsible for the service to the industry, felt that it was—it had to work out a price to it which would provide for bad debts, the carrying of the accounts, leakage and such, and maintenance of the lines used in connection with the sale of industrial gas.

"Q. In the sale of industrial gas the Kansas City Gas Company's financial interest is only the rental it receives for the gas going through its mains. Is it not? A. No. It is responsible to the industry for that service. If it can't obtain that industrial gas from the pipe line company, then it would have to seek that service from some other source or discontinue that service. But the Kansas City Gas Company is responsible, for instance, for the bad debts; the Kansas City Gas Company has to stand that loss. There is a loss in leakage in the system, and the Kansas City Gas Company stands that loss at forty cents a thousand cubic feet. If there was a damage suit of any kind, the Kansas City Gas Company would be the party that would be responsible, in so far as any responsibility lying in the handling or operation of its lines.

"Q. The net on all steps where an industrial consumer pays less than forty cents—the net proceeds which the Kansas City Gas Company receives, is the same, namely 3½ cents. Is it not? A. Yes, sir; that is correct.

"Q. The pipe line company receives all of the proceeds of the sale of gas, according to the schedule, at less than forty cents—less 3¼ cents, does it not? In other words, where gas is sold on your industrial schedule at less than forty cents, the pipe line receives all the proceeds per thousand cubic feet less 3½ cents? A. Well, you would have this situation in mind, that where an industry has failed to pay its bill or for various reasons the bill is not paid, the Kansas City Gas Company has to pay the pipe line

company for that gas, but it does not receive any money. In other words, the distributing company has to take the loss. And the same way—I have an industry in mind which has been behind in its bills all the way from two weeks to several months and there is possibly some question in my mind as to whether we are really going to receive the payment, but that gas was paid for at the time to the pipe line company, but the distributing company does not receive any money until the bill is paid by the company that used the gas.

"Q. The pipe line company is primarily interested, is it not, in the price at which industrial gas is sold, because it receives the purchase price of that industrial gas, or a large part of it—less 3½ cents—does it not? A. I don't think it is any more interested than the Kansas City Gas Company, because the Kansas City Gas Company wants to make an earning there to apply on its income.

"Q. The Kansas City Gas Company receives a net of 3½ cents for industrial gas which it carries through its mains and delivers to industrial customers where the selling price is less than forty cents? A. Yes, sir.

"Q. And the more industrial gas it carries through its mains, the more three and a half cents per thousand cubic feet it will get? A. Yes, sir.

"Q. In all cases where the Kansas City Gas Company receives three and a half cents per thousand cubic feet, the pipe line company receives the selling price less 3½ cents per thousand cubic feet? A. Yes, sir.

"Q. Well, is not the pipe line company more interested in the selling price of that gas than the distributing company, because it is the one that receives the net proceeds, less 3½ cents? A. I don't know that they are more interested. There may be more profit to the distributing company than the pipe line company. I am not in a position to know that they may not be any more interested than the distributing company. I do not know what it costs the pipe line company to deliver that gas, and their net profit from the sale of that gas may not be any more than the net profit of the distributing company.

"Q. I understood you to say that the Kansas City Gas Company fixes the price at which industrial gas is sold? A. Yes, sir.

"Q. If the Kansas City Gas Company, which is interested in the 3½ cents it gets, would fix the price at 4 cents per thousand cubic feet, it could probably sell lots more industrial gas and make more three and a half cents per thousand cubic feet. A. Yes.

"Q. Would the pipe line company stand for that? A. I am not in a position to say what the pipe line company would do, Judge.

"Q. Under the circumstances, does the pipe line company give the Kansas City Gas Company complete freedom in fixing that industrial

schedule? A. That industrial schedule is fixed, as I have said, in this way: The Kansas City Gas Company surveys the market and says, we feel that we can sell gas at a certain price, and says to the pipe line company, we can afford to pay you so much for that gas. And the pipe line company has said, we will take it providing you submit each one of these contracts so that we know the amount to be furnished and the conditions under which it is to be furnished.

"Q. I don't understand how the distributing company can care what the selling price of industrial gas is, so long as it is getting $3\frac{1}{2}$ cents per thousand cubic feet no matter what the selling price is. Can you explain that? A. No.

"Q. Why is it that the pipe line company will let you fix the price for the sale of industrial gas when it is the one—practically the only one interested in what it sells for, because it gets the difference between the selling price and $3\frac{1}{2}$ cents? A. We are interested in selling it just as cheap as we can sell it.

"Q. Then why don't you sell it for five cents? A. There might be an additional volume of sales if we did, and the Kansas City Gas Company might figure that it could afford to sell it—if it sold it for 5, it might be able to pay the pipe line company $3\frac{1}{2}$ cents for it and still sell it for 5 if it felt that there was an increased volume it could make an earning on. The volume enters into any consideration of it."

The testimony of this witness is argumentative, evasive and contradictory. He either knew or had been told that this situation also was "ticklish."

In the face of the above-stated facts and the testimony of the witness Strickler, the majority opinion ruled that there was no substantial evidence tending to show agency. In view of said ruling I make inquiries as follows:

(a) If the Kansas City Gas Company owns the gas sold to industries within the city, why is it impossible for the industries to purchase from said company the gas? The evidence shows conclusively that the industries cannot do so. Every detail of the transaction must be approved by the Pipe Line.

(b) If the Kansas City Gas Company owns the gas sold to the industries within the city, why is it necessary for said company to enter into an "arrangement" with the Pipe Line, whereby the Kansas City Gas Company becomes a solicitor of contracts for the sale of gas to the industries? If the Kansas City Gas Company owns the gas, there would be no necessity for said arrangement. The Kansas City Gas Company would solicit said contracts on its own account.

(c) If the Kansas City Gas Company owns the gas, why is it necessary to submit the contract signed by the industry to the Pipe Line before the Kansas City Gas Company signs the contract?

(d) If the Kansas City Gas Company owns the gas, why is the Pipe Line alone interested in the price paid for the gas by the industry?

(e) If the Kansas City Gas Company owns the gas, why does it receive 3½ cents per thousand cubic feet regardless of the price paid by the industry for the gas?

"The essential attributes of ownership of property, real and personal, are the rights in the owner to control, handle, and dispose of the thing owned. Converse v. Kellogg (N. Y.), 7 Barb. 590; Hill v. Cumberland Valley Mut. Protection Co., 59 Pa. (9 P. F. Smith) 474." [Hardinge v. Empire Zinc Co., 148 Pac. 306, l. c. 312.] If the Kansas City Gas Company has a scintilla of control of the transactions whereby industrial gas is sold to consumers in Kansas City, I am unable to discover.

Instead of answering these questions presented by the record, the majority opinion, as above stated, adopted the argumentative conclusions of the Pipe Line as the "ascertained facts" in the case, and then, without the suggestion of a reason, solemnly announced that there was no substantial evidence tending to show that the Pipe Line sold gas to the industries. I suspect that the bench, the bar and the public would appreciate an effort on the part of the majority opinion to answer these questions.

I also make inquiry as follows:

(f) If the Kansas City Gas Company owns the gas sold to the industries within the city, why does the Pipe Line fix the price to be paid for said gas?

The majority opinion attempts to answer this question by stating that "it has many times been held that the vendor has a right to fix the price at which the vendee may sell the merchandise, citing Banker Bros. Co. v. Commonwealth of Pennsylvania, 56 L. Ed. 168; Standard Fashion Co. v. Magrane-Houston Co., 66 L. Ed. 653; Watkins Medical Co. v. Holloway, 182 Mo. App. 140. 168 S. W. 290; Burkhalter v. Ford Motor Co., supra; Reiter v. Anderson (Cal.), 262 Pac. 415; Rawleigh v. Trerice (Mich.), 195 N. W. 79; Chapman & Co. v. Dowling Hardware Co. (Ala.), 88 So. 748."

In those cases it was held that a manufacturer could lawfully fix a blanket retail price for the article manufactured. In the instant case the evidence shows that the Pipe Line did not fix a blanket price. On the contrary the industries were charged different prices.

Furthermore, those cases ruled purely private transactions. The public, as such, was in no way interested. I assume that no one will contend that the price to the consumer of a utility commodity can be fixed by either the wholesaler or retailer of said commodity. The price of said commodity is under the supervision of the Commission. The cases are not in point.

But the Pipe Line leans heavily on the absorption of leakage and

bad debts by the Kansas City Gas Company, the liability of said company to the industry for service, and the absence of the Pipe Line's signature from the contract with the industry for the sale of the gas.

It is elementary that an agent or bailee to transport and deliver may lawfully increase its liability above its ordinary liability by contract or "arrangement." Furthermore, it should be noted as follows:

(a) There is no evidence on the question of leakage. It may be inferred if the leakage was consequential, the Pipe Line would have produced evidence tending to show that fact.

(b) It is common knowledge that all utility commodities are sold for cash on the meter reading. Furthermore, the written contracts with the industries provide for discontinuance of service without notice. On failure of the industry to pay, service could instantly be discontinued. In this situation the loss on account of bad debts could not be consequential.

(c) The Kansas City Gas Company receives all of its gas requirements from either the Pipe Line or lines controlled by the Pipe Line. Indeed, the evidence shows that the Pipe Line either owns or controls all of the gas available for distribution in the territory under consideration. It follows that the Kansas City Gas Company must procure the gas distributed to the industries from either the Pipe Line or lines controlled by said company. In this situation the contracts with the industries protect the vendor from liability for failure of service by providing that the vendor does not by this contract undertake to furnish the vendee a full and uninterrupted supply of gas for the period named in the contract and by providing that the supply of gas may be discontinued to the industry without notice on account of accidents, breaks in line, repairs, shortage of gas, etc. Thus vanishes the claim of liability on the part of the vendor for failure of service.

(d) Of course, the majority opinion does not contend that the absence of the Pipe Line's signature from the contract with the industries is conclusive on the question. The country is alive with contracts executed in the name of an agent. This method is frequently used to conceal the real party in interest. Indeed, in this case the evidence shows that, under said "arrangement," said method was used to conceal the fact that the Pipe Line was the real party in interest.

Furthermore, on again reading the testimony of Strickler it will be noted that he continually "sent up" the theory of absorption of leakage, bad debts and liability for service on the part of the Kansas City Gas Company "as a smoke screen" to hide the activities of the Pipe Line as the dominant company.

In this connection he testified that "if there was a damage suit

of any kind, the Kansas City Gas Company would be the party that would be responsible in so far as any responsibility lying in the handling or operation of its lines.'' This statement is not startling. All agents to transport and deliver are liable for negligence ''in the handling or operation of its lines.''

It also should be stated that even if the Pipe Line does not disregard the corporate entity of the distributing companies, the relationships existing between the companies should be considered on the question of agency. ''Unity of control'' and ''community of interest'' furnish an opportunity and a fertile soil for coercion on the part of a dominant company.

I think said relationships should be considered on the authority of Western Distributing Co. v. Public Service Commission of Kansas, 285 U. S. 119; Smith v. Illinois Bell Telephone Co., 282 U. S. 133; Dayton Power & Light Co. v. Public Utility Commission of Ohio, 78 L. Ed. 1267, and Houston v. Southwestern Bell Telephone Co., 66 L. Ed. 961.

On a consideration of this question, the majority opinion states that ''these cases do not discuss the question of agency, but simply hold that where one corporation controls another corporation through stock ownership, then the two companies are not dealing at arm's length with each other, and in making contracts that might affect the rates the public must pay to the utility, it has the burden to show that such contracts are reasonable.'' After making said statement, it rules that in the instant case no question of rates is involved and therefore it is not important that the Pipe Line and distributing companies are affiliated companies.

I am unable to follow this course of reasoning. It is true that in the instant case there is no question of increasing or decreasing rates. But in this case the record presents the question of whether or not the Commission has jurisdiction to consider the question of increasing or decreasing rates. If it has jurisdiction of both the Pipe Line and the distributing companies, it has authority to regulate the industry gas rates. The principle announced in those cases is that in transactions between affiliated companies involving a public interest, close scrutiny of the dealings of said companies is enjoined upon the courts to prevent imposition upon the public. Clearly, the cited cases are in point. The majority opinion, with as much reason, could have ruled that a principle of law announced in a replevin suit to recover possession of a horse would not be authority in a replevin suit to recover possession of a cow.

In Berkey v. Third Ave. Ry. Co., 244 N. Y. 84, 1. c. 95, 155 N. E. 58, Mr. Justice CARDOZO, then Judge of the New York Court of Appeals, said: ''Dominion may be so complete, interference so obtrusive, that by the general rule of agency a parent will be a principal and a subsidiary an agent.''

The evidence considered, I submit that it would be a travesty on justice to reverse the judgment of the circuit court on the question of agency.

■ II. I next consider the question of whether or not the Pipe Line has destroyed the corporate entity of the distributing companies.

At the hearing before the Commission certain officials testified that the business transactions between the Pipe Line and the distributing companies were under "arrangements or oral undertakings," whatever that may be. An official for one of the distributing companies testified that he was familiar with the terms of said "arrangement or oral undertaking" only so far as he had "put it into operation."

This method of transacting business called for an explanation. Thereupon an attorney for the distributing companies testified in effect that no lawful contract covering the business transactions between the Pipe Line and the distributing companies could be drawn. He cited Landon v. Court of Industrial Relations of State of Kansas, 269 Fed. 411, as sustaining said statement. I have read the opinion in said case. It does not rule that a valid contract for the sale and purchase of gas could not exist between the Pipe Line and the distributing companies. Indeed, it is unthinkable and unbelievable that the Pipe Line could not enter into a valid contract with an independent distributing company for the sale and purchase of gas. I think the explanation given by the attorney should itself be explained.

Other officials testified that the business transacted between the Pipe Line and the distributing companies was under a "day to day arrangement." This means that said business was transacted under an hour to hour arrangement, minute to minute arrangement or second to second arrangement. In other words, the Pipe Line could discontinue the supply of gas to the distributing companies without notice. All know that an independent affiliated company would not transact business under such an "arrangement." Clearly, the Pipe Line is dealing with itself when it supplies gas to the distributing companies. The separate existence of the distributing companies as corporations is a "mere sham." [Martin v. Development Co. of America, 240 Fed. 42.]

Furthermore, the proceeding before the commissioner was directed against the Pipe Line. It may be inferred that the distributing companies were parties to facilitate the production of records. They did not appeal from the order of the Commission. At the hearing before the commissioner the attorneys for the distributing companies, while appearing as such, in fact represented the Pipe Line. Thereafter, one of said attorneys appeared before the Commission, the circuit court and this court as attorney for the Pipe Line. This

tends to show domination on the part of the Pipe Line. It also would be significant if said attorney was, in fact, the attorney for both the Pipe Line and the distributing company. Furthermore, the witness Strickler, in giving his testimony in this case, made valiant efforts to protect the pipe line. This also tends to show domination on the part of said company.

Furthermore, the evidence on the issue of agency shows that the Pipe Line controls the distribution of industrial gas to consumers. If the distributing companies were independent companies they would not permit this domination on the part of the Pipe Line.

Furthermore, the Cities Service Company owns all the common stock of both the Empire Gas & Fuel Company and the Gas Service Company, except the shares necessary to qualify directors. The Empire Gas & Fuel Company owns all the common stock of the Cities Service Gas Company except the shares necessary to qualify directors. And the Gas Service Company owns all the common stock of the distributing companies except the shares necessary to qualify directors.

Thus it appears that the Cities Service Company, through its subsidiary companies, owns and controls all the common stock of the distributing companies except qualifying shares for directors. It follows that the Cities Service Gas Company, as a subsidiary of the Cities Service Company, controls the common stock of the said companies.

The question was considered and ruled in Gallatin Natural Gas Co. v. Public Service Comm. (Mont.), 256 Pac. 373. In that case many authorities on the question are cited, l. c. 377, 378, 379. In this connection it should be stated that the opinions in Chicago, etc., Ry. Co. v. Minn. Civic Assn., 247 U. S. 490, and United States v. Reading Co., 253 U. S. 26, 61, 63, may be read with profit.

There is no evidence in the record indicating a single uncontrolled act on the part of the distributing companies. The Pipe Line has totally destroyed the corporate entity of said companies. In other words, the Pipe Line and the distributing companies are one and the same business activity. It also follows that the gas transported by the Pipe Line into this State and distributed by the distributing companies is a local and intrastate business. If so, it is selling and locally distributing gas to industries in the cities.

■ III. I next consider the condemnation of private property by the Pipe Line.

It is stated in the majority opinion that the Pipe Line secured a permit from the Commission to lay pipe lines in this State. There is no evidence in the record on the question. The statement authorized an examination of the records of the Commission to learn the facts. I have made the examination, and the record follows:

On January 10, 1929, the Commission heard the application of the Pipe Line for a certificate of convenience and necessity to con-

struct seventy-three miles of pipe line in southwest Missouri. On the evidence the Commission issued a certificate and ordered said company to file, subject to the approval of the Commission, a schedule of rates for gas service in Missouri. The Commission retained jurisdiction to make further orders if necessary. The Pipe Line did not file a schedule of rates. Of course, the order granting said certificate was not valid until the company filed said schedule.

Thereafter the Pipe Line made application to the Commission for another certificate of convenience and necessity to construct lines in Missouri for the purpose of transporting gas from Oklahoma and Kansas into this State. The application was denied on the ground that it involved transportation in interstate commerce. Thereafter the company dismissed other applications for certificates.

The Pipe Line owns all the gas transported through its lines. It contends that it is not a common carrier. If so, it could not condemn private property. [Sec. 20, Art. II of the Constitution.] To evade this provision of the Constitution, it made applications to the Commission for said certificates. And, even though it was without authority from the Commission, it instituted suits in the courts of this State and condemned private property for private use. In the petition in said suits it alleged "that it is a corporation organized for the purpose, among other things, of transporting and carrying gas by means of pipe lines laid underneath the surface of the ground through the States, among others, of Oklahoma, Kansas and Missouri, for the distribution and sale of gas as a public commodity, and for the public use and convenience; . . . that to carry out such purpose in the State of Missouri plaintiff has the permission and authority of the Public Service Commission of the State of Missouri to lay said pipe line underneath the surface of the ground through Missouri . . . and through the tracts and parcels of land which plaintiff asks herein to appropriate for said public use."

The majority opinion proceeds upon the theory that criticism is directed against the allegation in said petitions as to the power of the company under its charter. It quotes from State ex rel. Danciger & Co. v. Public Service Comm., 275 Mo. 483, l. c. 493. 205 S. W. 36, as follows:

". . . . it is enough to say that in determining whether a corporation is or is not a public utility, the important thing is not what its charter says it may do, but what it actually does. [Terminal Taxi Cab Co. v. Kutz, 241 U. S. 252.]"

The rule is correctly stated. But absent criticism of said allegation of the petition, the rule is without application. The criticism is directed against the allegation that the company had the permission and authority of the Commission to lay pipe lines in this State. This conduct on the part of the company and its attorneys was a fraud on the Commission, the courts, and the people of this State.

On the point the majority opinion also cites Sections 4596 and 1340; Southern Illinois Bridge Co. v. Stone, 174 Mo. 1; Ozark Pipe Line Co. v. Monier, 69 L. Ed. 439.

It is certain that Section 4596 gives to a foreign corporation no greater power than to a domestic corporation. It would not be contended that a domestic corporation could condemn private property for private use.

Under Section 1340 the Pipe Line had power to condemn land if for public use. But the Pipe Line did not condemn land for public use. It condemned land for use as a carrier of its own gas.

The Southern Illinois Bridge Co. case also is not in point. It ruled that our Constitution did not prohibit the Legislature from conferring on a foreign corporation the right to condemn private property for public use.

The Ozark Pipe Line Corporation obtained a license from this State to engage "exclusively in the business of transporting crude petroleum by pipe line." The line extends from Oklahoma through Missouri and to Illinois where the oil, transported as a common carrier, is delivered. Oil is neither received nor delivered in this State. We attempted to collect an annual franchise tax from the corporation It was ruled that said corporation was engaged only in interstate commerce and that the tax could not be collected. The point was made that the corporation was also authorized to engage in local business. It was ruled that "the power to tax depends upon what was done and not upon what might have been done." It also was ruled that the receipt of a Missouri license and the power thereunder to exercise the right of eminent domain did not authorize the collection of the tax.

I am unable to account for the citation of this authority. The corporation, being an interstate common carrier, is authorized to condemn private property.

However, this fraudulent conduct on the part of said company is not material to any issue in this case. If the question was whether or not said company was a common carrier, it would be material.

On a consideration of said conduct on the part of the company the majority opinion made the statement above set forth and other statements. If the question was ignored, it might be misunderstood. For this reason I have given my views.

I concur in the ruling of the majority opinion that the Pipe Line is engaged in interstate business by directly selling and distributing industrial gas to consumers in this State, outside of the cities.

However, it is not proper to infer "that the gas is delivered from the foreign state directly to the industrial consumer in this State in compliance with a contract that was in existence between said consumer and the Pipe Line." The twelve contracts with the industrial

consumers outside of the cities are in evidence. It is provided in said contracts as follows: ''Vendor agrees to sell and deliver to Vendee, and Vendee agrees to purchase and receive from Vendor at Vendor's meter located at Vendee's lime plant at —— Mo., subject to the terms and conditions herein, etc.''

For the reasons stated, the judgment of the circuit court affirming the ruling of the Commission on the question of the sale of gas to industries in the cities should be affirmed, and the judgment of said court affirming the ruling of the Commission on the question of the sale of gas to industries outside the cities should be reversed. *Frank, C. J.*, concurs.